**HOLLINGER INTERNATIONAL, INC., Plaintiff,**

v.

**Conrad M. BLACK, Hollinger, Inc. and 504468 N.B. Inc., Defendants.**

and

**Cardinal Value Equity Partners, LP, Press Holding International Limited, and Press Acquisition Inc., Intervenors.**

**Conrad M. Black, Hollinger Inc., and 504468 N.B. Inc., Counterclaim–Plaintiffs,**

v.

**Hollinger International, Inc., Counterclaim–Defendant,**

v.

**Richard C. Breeden, Richard Breeden & Co., Gordon A. Paris, James R. Thompson, Richard D. Burt, Henry A. Kissinger, Richard N. Perle, Shmuel Meitar, Graham W. Savage and Raymond G.H. Seitz, Additional Counterclaim–Defendants.**

**C.A. No. 183–N.**

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 22, 2004.
Decided: Feb. 26, 2004.

David C. McBride, Bruce L. Silverstein, C. Barr Flinn, Rolin P. Bissell, Christian Douglas Wright, Stephen E. Smith, and Glenn C. Mandalas, Young Conaway Stargatt & Taylor, LLP, Wilmington; Martin Flumenbaum, Leslie Gordon Fagen, Daniel J. Kramer, and Robert A. Atkins, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York City, for Plaintiff and Counterclaim Defendant Hollinger International Inc.

Jesse A. Finkelstein, Raymond J. DiCamillo, Candice M. Toll, Becky A. Allen, Michael R. Robinson, and Elizabeth C. Tucker, Richards, Layton & Finger, P.A., Wilmington, for Defendants Conrad M. Black, Hollinger Inc., and 504468 N.B. Inc.; John L. Warden, David H. Braff, and James V. Masella, III, Sullivan & Cromwell, LLP, New York City, for Conrad M. Black; Gregory P. Joseph, Sandra M. Lipsman, Douglas J. Pepe, Gregory P. Joseph Law Offices, LLC, New York City, for Hollinger Inc. and 504468 N.B. Inc.

R. Bruce McNew, Taylor & McNew, LLP, Greenville, for Intervenor–Plaintiff Cardinal Value Equity Partners, LP.

Paul J. Lockwood and Kay P. Lawson, Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington; Robert E. Zimet, Christopher P. Malloy, and William J. O'Brien, III, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, for Intervenors Press Holdings International Limited and Press Acquisition Inc.

Andre G. Bouchard and Joel Friedlander, Bouchard Margules & Friedlander, Wilmington; Robert E. Curry, Kirby McInerney & Squire, LLP, New York City, for Tweedy, Browne Company, LLC.

David A. Jenkins and Dominick T. Gattuso, Smith, Katzenstein & Furlow, LLP, Wilmington, for Coastal Income Corp.

## OPINION

STRINE, Vice Chancellor.

As former Chancellor Allen has said, the most interesting corporate law cases involve the color gray, with contending parties dueling over close questions of law, in circumstances when it is possible for each of the contestants to claim she was acting in good faith.[1] Regrettably, this case is not one of that variety.

Rather, in this case, defendant Conrad M. Black, the ultimate controlling stockholder of Hollinger International, Inc. ("International"), a Delaware public company, has repeatedly behaved in a manner

1. William T. Allen, *Ambiguity In Corporation* *Law,* 22 Del. J. Corp. L. 894, 899 (1997).

inconsistent with the duty of loyalty he owed the company. Black faced potentially serious accusations of self-dealing on his own behalf, and on behalf of an intermediate holding company he dominates and controls, at the expense of International. He sued for peace realizing that International's independent directors might strip him of all his corporate offices and refer certain matters to the Securities and Exchange Commission before Black could take steps to remove them (and knowing that he faced serious personal repercussions if he took that aggressive step). The indignity Black faced was galling to him, as the International board was largely filled with outside directors Black had hand-selected and with whom he had a personal relationship.

To calm the roiled waters, Black made a formal contract, the "Restructuring Proposal," involving many key features. They included his agreement to resign as Chief Executive Officer and to repay certain funds without any admission of wrongdoing. Critically, Black also agreed to stay on as Chairman and devote his principal time and energy to leading a "Strategic Process" involving the development of a value-maximizing transaction for International, such as the sale of the company or some of its assets. Black told the International directors that this Process would be for the "equal and ratable" benefit of all of International's stockholders, and that he would refrain from consummating transactions at the level of the intermediate holding company he dominated, except under strict conditions.

But, Black immediately violated his newly undertaken obligations by diverting to himself a valuable opportunity presented to International—the possible sale of one of its flagship newspapers, the Daily Telegraph, or the company as a whole to the Barclays, English brothers who own newspapers, hotels and other businesses. Black accomplished this diversion in a cunning and calculated way, fully detailed in this opinion. During the course of his dealings, Black misrepresented facts to the International board, used confidential company information for his own purposes without permission, and made threats, as he would put it, of "multifaceted dimensions" towards International's independent directors.

As the culmination of his misconduct, Black unveiled a transaction involving the sale of the holding company through which Black wields voting control of International to the Barclays. The "Barclays Transaction," if consummated, would prevent International from realizing the benefits of the Strategic Process Black had contractually promised to lead with fidelity and energetic commitment. Effectively, the Barclays Transaction would end the Strategic Process before the bidding even began. The Barclays Transaction was also one that Black had, by contractual promise in the Restructuring Proposal, agreed not to effect.

When the International board took measures to stop the Barclays Transaction by considering a shareholder rights plan, Black caused the holding company he controlled to file a written consent enacting "Bylaw Amendments" requiring unanimous action by the International board for any significant decision, abolishing a committee that had been created to consider how International should respond to the Barclays Transaction, and thereby effectively permitting himself to disable International's independent directors from obstructing the completion of Black's injurious course of conduct. Believing the Bylaw Amendments to be unlawful and inequitable, the International independent directors, through a committee previously authorized to take such action, adopted a

shareholder rights plan (the "Rights Plan") to prevent Black from consummating the Barclays Transaction, contingent on a judicial declaration that their decision was permissible. International then brought this suit seeking 1) a preliminary injunction against the Barclays Transaction and further breaches of the Restructuring Proposal; 2) a declaration that the Bylaw Amendments were ineffective because they were, among other things, adopted for an inequitable purpose; and 3) a determination that the Rights Plan was properly adopted.[2]

Black and the intermediate holding corporation he controls joined issue, as did the Barclays. An expedited trial was held last week, briefing was completed shortly thereafter, and this is the court's decision.

In this opinion, I conclude that Black breached his fiduciary and contractual duties persistently and seriously. His conduct threatens grave injury to International and its stockholders by depriving them of the benefits that might flow from the Strategic Process's search for a value-maximizing transaction. In the course of his improper dealings, Black acted functionally as both principal and agent for his holding companies, without restraint from the boards of those companies, which he dominated. To rectify the irreparable harm Black's wrongdoing obviously threatens, an injunction will issue against the Barclays Transaction and further breaches of the Restructuring Proposal.

The Bylaw Amendments Black proximately caused to be adopted were designed to cement into place the Barclays Transaction, by disabling the International board from protecting the company from his wrongful acts. Thus, I conclude that

the Bylaw Amendments are inequitable and ineffective.

Finally, in these extraordinary circumstances, the International board has satisfied its burden under *Unocal* to justify the time-limited use of the Rights Plan to permit the completion of the Strategic Process in the contractually contemplated manner. The unique circumstances here involving serious breaches of duty by Black as a controlling stockholder and a concomitantly dangerous threat of imminent injury to International justify as proportionate the use of the Rights Plan to restore the independent directors' leverage and authority so that International may preserve its contractual expectations under the Restructuring Proposal and seek to help itself recover from Black's subversion of the Strategic Process.

The rich factual history of this dispute, the legal complexities that arise from it, and my resolution of them now follow.

### Factual Background

#### The "Hollinger" Corporate Structure

An understanding of the relationship among three corporate entities and Conrad Black is critical to the resolution of this dispute. I begin by emphasizing that Black was the creator of this group of companies, has personally dominated their affairs, and put in place boards to his liking. Black takes obvious (and arguably justifiable) pride in the successful newspaper empire he has assembled.

The relationships among the key components of that empire are now discussed.

At the bottom of this now-unhappy corporate family is the plaintiff Hollinger International, Inc., a Delaware corporation whose shares trade on the NYSE. For

---

**2.** Certain stockholders have intervened as plaintiffs and others have joined as *amicus* *curiae.*

simplicity's sake, I refer to it as "International." As of the period relevant to this case, International had become the primary operating company for newspaper assets associated with Black. International owns, through wholly owned subsidiaries, *The Chicago Sun–Times* and several community papers in the Chicago area, *The Daily Telegraph* and certain other assets in the United Kingdom, and *The Jerusalem Post* in Israel.

Since it became a public company, International has had a controlling stockholder, Hollinger, Inc., an Ontario corporation whose shares trade on the Toronto Stock Exchange.[3] For ease of reference, I refer to Hollinger, Inc. as "Inc.," an odd term, I admit, but one that many of the witnesses have used.[4] At one time, Inc. had significant operating assets of its own—including at the time International became a public company. Since the mid–1990s, however, Inc. has solely been a holding company, the principal—but not sole—asset of which is the ownership of 30.3% of the equity of International.[5] The equity Inc. owns in International has even more voting potency. The bulk—some 14,990,000 shares—of Inc.'s International stock consists of shares of Class B Common Stock which have a 10–to–1 voting preference over shares of International's Class A Common Stock, which is largely held by the public. Inc. also owns 11,256,538 shares of International Class A Common Stock. Inc.'s stock-

holdings in International give it control of 72.8% of International's voting power.

When International went public in the early 1990s, public investors were put on notice that Inc. had voting control and that this would limit the opportunity for public stockholders to benefit from transactions that did not have Inc.'s support. In particular, they were notified that Inc. would have substantial clout to block any takeover bid it did not favor.[6]

On the other hand, the public investors were also informed that International's certificate of incorporation provided that

> If a share of Class B Common Stock held ... by Hollinger Inc.... is to be sold, transferred or. disposed of to a third party ... other than in a Permitted Transaction ... each such share of Class B Common Stock shall be automatically converted into one ... share of Class A Common Stock immediately prior to ... the time of transfer to such third party.[7]

The public disclosures create the impression that this was a substantial tag-along right, because the certificate provision (the "Tag–Along Provision") seems designed to make sure that Inc. would share any control premium ratably with the other International shareholders. The Tag–Along Provision does so by stripping the Class B shares of their super-voting power if they are sold, transferred or disposed of in a non-Permitted Transaction.[8] A Permitted Transaction is a

---

3. Some of the entities had different names in earlier periods but they were always under the indirect or direct voting control of Black.

4. It has the added virtue of being easier to pronounce than the other choice, "HLG."

5. Inc.'s holdings in International are held partly through an entity called 504468 N.B., Inc., an indirect wholly owned Canadian subsidiary of Inc. that is also a defendant in this action. I will refer to that entity and Inc. collectively as Inc.

6. *See* JX 614 at 10.

7. Certificate of Incorporation of International, Art. IV, § E(2)(a). As noted, International's name changed. But this certificate provision has remained, in substance, unchanged since the company first went public.

8. *See* JX 614 at 61 (summary of Tag–Along Provision in IPO prospectus).

transaction with respect to the Class B Common Stock between Hollinger Inc.... and a third party ... in which or as a part of which such third party purchaser or transferee makes an Offer to purchase all of the outstanding shares of Class A Common Stock from the holders thereof for an amount ... equal to the amount per share to be received by the record holder of Class B Common Stock ... and such Offer is consummated simultaneously with the consummation of the Permitted Transaction between Hollinger, Inc.... and such third party.[9]

As the defendants in this action have noted, however, the Tag–Along Provision has a rather gigantic loophole. By its explicit terms, the Tag–Along Provision is not triggered by a sale of Inc. itself. In fact, the Tag–Along Provision expressly states that the Class B shares will not convert into Class A shares if Inc. transfers them to an "Affiliate," including "the surviving ... corporation or entity in any merger ... or other business combination involving Hollinger Inc." [10] This escape hatch in the Tag–Along Provision is enormous. Indeed, under the defendants' interpretation, Inc. could, at any time, have dropped its International shares into a subsidiary and simply sold that subsidiary. In their view, that type of transaction would not trigger the Tag–Along Provision and the purchaser of the subsidiary would continue to control Class B shares with super-voting power.

As we shall see, the Tag–Along Provision is part of the equitable environment of this dispute. International and its public stockholders claim that any supposed "right" of Inc. to seek a control premium for itself in any transaction vesting voting

control of International in a third-party is contradicted by the implied covenant of good faith and fair dealing inherent in the International certificate of incorporation. Otherwise, the Tag–Along Provision was simply an illusory promise of protection inserted by Inc. to provide false assurances to public investors in International. By contrast, Inc. and the other defendants say that the Tag–Along Provision clearly does not cover a sale of Inc. itself and that public investors are expected to read and understand certificate provisions that are plain on their face. No claim is now pending that requires me to determine the applicability of the Tag–Along Provision to the Barclays Transaction. Rather, the existence of the Tag–Along Provision has relevance solely as part of the factual circumstances taken into account by the parties in shaping their courses of conduct.

At all relevant times to this dispute, Inc. has been controlled by the last entity through which Black ultimately controls International: The Ravelston Corporation Limited ("Ravelston"), which owns approximately 78% of Inc.'s common stock and is a private company Black personally dominates and controls. Black, through another personal holding company, owns over 65% of Ravelston. Inc. also has investors other than Ravelston, including a number of public stockholders.

The evidence reveals that Black is a formidable controlling stockholder. At all times he has held himself out to the world as able to control Ravelston, Inc., and International. In particular, during all times relevant to this case, Black has conducted himself as if only his assent was needed to cause Inc. or Ravelston to enter into any major transaction. The Inc. and Ravelston boards, as now composed, have com-

9. Certificate of Incorporation of International, Art. IV, § E(2)(d)(iii).

10. Certificate of Incorporation of International, Art. IV § E(2)(d)(i).

ported themselves in a supine manner that confirmed Black's confidence in his power. As to International, the picture is more complex but one thing is clear: Black believed himself to be the initial arbiter of what should be done with International and its assets, to the exclusion of the rest of the company's directors. To the extent he could, Black led the financial world to believe that the collective "Hollinger" family was firmly under his personal control.

What is also obvious is that there is a disparity between Black's voting power over both International and Inc. and his actual economic stake in the equity of those companies. Especially at the International level, there is a great discrepancy between the voting control Black practically wielded (which was nearly absolute) and his personal economic stake which, when filtered through Inc. and Ravelston, was around 15%.

### The International Board Of Directors

Immediately before the events relevant to this case, the International board was composed of a close balance between inside and outside directors. The inside directors consisted of:

- Defendant Black—Black served as Chairman and Chief Executive Officer of International. He occupied the same offices at Inc. and Ravelston.
- Barbara Amiel Black—Mrs. Black is Conrad Black's wife. She is a journalist and author who is a Vice President of International, and holds positions at Inc. and Ravelston. Mrs. Black is a Ravelston stockholder.
- F. David Radler—Radler was director, President and Chief Operating Officer of International and Inc. Radler is a Ravelston officer and stockholder.
- Daniel W. Colson—Colson was Vice Chairman of the board of both International and Inc. and a senior officer

of International. Colson is a Ravelston officer and stockholder.

- Peter Atkinson—Atkinson was an Executive Vice President and director of International and held positions at Inc. and Ravelston. He is a Ravelston stockholder.

The outside directors were:

- Richard Burt—Before entering the business world, Burt held several high-level positions within the United States Department of State, including serving as a chief negotiator to the Strategic Arms Reduction Talks and Ambassador to Germany.
- Henry Kissinger—Before entering the consulting field, Kissinger was, among other things, Secretary of State for the United States and National Security Advisor to Presidents Nixon and Ford.
- Shmuel Meitar—Meitar is Vice Chairman of Aurec Ltd., a communications and media business.
- Richard N. Perle—Perle is a Resident Fellow at the American Enterprise Institute. Before that, he served as Assistant Secretary for the United States Department of Defense for International Security Policy during most of the Reagan Administration.
- James R. Thompson—Thompson is Chairman of Winston & Strawn. Before that, he served four terms as Governor of Illinois.

### The Management Structure At International

As of the beginning of 1993, International's top management was employed through a contract with an affiliate of Ravelston. That is, most of the executives, including Black and his top subordinates, were directly employed by and owned stock in Ravelston, which received payments from International for its manage-

ment of International. Put simply, International's top executives not only worked for Black in his capacity as CEO of International and understood the practical voting control he exercised over that company, they were also subordinate to and drew benefits from Black in their roles at Inc. and Ravelston.

### International Adds New Independent Directors To Begin An Internal Investigation

In May 2003, Tweedy Browne Company, LLC ("Tweedy Browne"), one of International's largest stockholders, wrote to the board. Tweedy Browne demanded that the board investigate the payment of over $70 million in non-competition payments made to Black, Radler, Atkinson, and another International executive, J.A. Boultbee.[11] These payments, Tweedy Browne believed, had been received through Ravelston or its affiliates in connection with asset sales made by International in 2000. The demand letter asserted that these payments were violations of the duty of loyalty owed by the recipients to International. A later letter reiterated the earlier allegations and also demanded that the International board investigate certain management contracts and an asset sale.

At a June board meeting, the International board resolved to form a "Special Committee" with the mandate and power to investigate and, if it believed warranted, prosecute litigation on behalf of International as to the matters raised in the demand letters. By that time, a new director, Gordon A. Paris, had been elected at the May annual meeting. Paris is Managing Director of Berenson & Co., a New York investment bank, and heads its media practice.

Black had solicited Paris's interest in joining the International board and had informed Paris that one of his roles would be to examine the management fees that were being paid to Ravelston. Therefore, once the Tweedy Browne demand letter came in, it was natural that Paris would be asked to lead the Special Committee process.

The practical problem the board faced, however, was that the Tweedy Browne allegations were targeted not only at the recipients of certain payments but also at the outside directors who had (by action or inaction) permitted them to occur. Paris was thought to be the only director who could investigate the demand with entire impartiality. Realizing that a single-member Special Committee was oxymoronic and unwise,[12] the International board decided to add new directors who could join Paris on the Special Committee.

Black and his executive team took the lead in identifying two new directors for that purpose. Raymond Seitz and Graham Savage joined the board recognizing that they would be appointed to the Special Committee. Seitz had entered the business world as Vice Chairman of Lehman Brothers (Europe) in the early 1990s, after a distinguished career as a diplomat, culminating in his service as Ambassador to the Court of St. James. Savage is Chairman of a merchant-banking firm in Toronto, having served for two decades as an executive at a major Canadian media company.

---

**11.** JX 81.

**12.** The classic lesson in the dangers of single-member committees is set forth in Lewis v. Fuqua, 502 A.2d 962 (Del.Ch.1985). See id. at 967 (stating that special litigation committee must be "truly independent" and that "[i]f a single member committee is to be used, the member should, like Caesar's wife, be above reproach").

Seitz and Savage joined the board and the Special Committee in late July 2003. As advisors, the Special Committee hired O'Melveny & Myers and Richard Breeden. Breeden's role is a subject of some dispute. According to International, Breeden served with O'Melveny as counsel personally, and International engaged his business (Richard C. Breeden & Co.) as consultants to provide financial analysis supporting him and O'Melveny. Before forming his own company, Breeden had served for many years in high-level positions in the federal government under Presidents Reagan, Bush, and Clinton, culminating in his service as Chairman of the Securities and Exchange Commission.

### The Barclays Approach Black About The Daily Telegraph

Tweedy Browne filed a copy of its demand letters on Schedule 13–D with the SEC. These and other events focused unwelcome attention on Black and the Hollinger family of companies. Newspaper reports suggested that Inc. was under some financial pressure.

These reports followed on stories in the press in May 2003. At that time, David Barclay had written to Black and "register[ed]" an interest in Black's "UK interests"—i.e., in The Daily Telegraph and other related British assets owned by International.[13] Along with his brother Frederick, David Barclay controls an array of businesses, which own media assets in the UK and Europe such as the newspapers *The Scotsman, Edinburgh Evenings News,* and *The Business,* and other valu-able assets such as the Ritz Hotel in London and the Mirabeau Hotel in Monte Carlo, as well as various retail businesses in the UK.[14] By his own statements and conduct, Black has acknowledged at all times that the Barclays had the financial wherewithal and business integrity to be responsible purchasers of *The Daily Telegraph* or any set of assets owned by International, or the equity of International as a whole. In June, David Barclay wrote Black again about the Telegraph. Black rebuffed the Barclays.

More adverse publicity about the Hollinger family of companies appeared in September. On its heels, David Barclay renewed his interest in purchasing the Telegraph, despite his appreciation that Black did "not wish to sell The Telegraph" and Barclay's own desire not "to be a bore."[15] In connection with that, Barclay offered to discuss helping Inc. with its financing and becoming an investor in Inc. Barclay suggested a meeting between himself (or his son, Aidan Barclay), on the one side, and Black on the other.[16]

In his response the next day, Black chided Barclay for giving the "slightest credence" to the press stories about Inc.'s financial troubles.[17] Black trumpeted the prosperity of Inc. and indicated that "as I have written before, the Telegraph titles are absolutely not for sale." While willing to meet with David Barclay or Aidan Barclay, Black noted that if the true purpose of the meeting was to "sidle up to a phased or disguised" purchase of the Telegraph, there was "no point" and David Barclay

---

13. JX 468.

14. For simplicity's sake, I refer solely to the Barclays themselves in the remainder of this opinion. The Corporations though which they are seeking to acquire all of Inc.'s equity are defendants Press Holdings International Limited and Press Acquisition Corp.

15. JX 468.

16. JX 468.

17. JX 468.

would "indeed be transgressing [his] expressed wish not to be a bore." [18]

David Barclay's desire to avoid being boorish was soon overwhelmed again by his avid desire to buy The Telegraph. After a news story came out indicating that Inc.'s credit rating might be downgraded, Barclay again wrote to Black, stating:

> I just wish to reiterate that in spite of your letter of September 2nd, 2003, I am more than happy to talk to you ... if you would be willing to meet.
>
> *It is clear our interests lie in the UK Telegraph, but I would not exclude any part, or whole of the business,* or providing additional equity capital to one of your private companies.[19]

On November 3, 2003, Black responded as follows:

> Dear David,
>
> *You have made your desire to buy the Telegraph abundantly clear.* You may recall that when we actually met we agreed that I would be mad to sell it. In the unlikely event that my views on this subject change, I will not forget your interest.
>
> Please keep in mind how tiresome you would find it if every time I saw a negative article about you in the press I wrote of my unquenchable desire to buy an asset of yours that is not for sale. I'm happy to hear from you, but not on this subject again, please.[20]

Despite the fact International owned the Telegraph, *Black did not inform the International board of any of these communications.* On his own, Black decided to reject the opportunity.

### The Special Committee Concludes That It Must Take Urgent Action Regarding The Non–Competition Payments

By late October 2003, the Special Committee had come to a troubling conclusion; namely, that $15.6 million in so-called "non-competition" payments had been made by International to Black, Radler, Atkinson, and Boultbee—i.e., the International management team—without proper authorization. Furthermore, another $16.55 million in "non-competition" payments had been made by International to Inc.—even though Inc. had no operational capacity to compete with anyone.[21] Of these amounts, Black had received $7.2 million personally, as had Radler.

The payments to the individuals were supposedly connected to three asset sales.

The first was a November 2000 sale of a group of newspapers for approximately $90 million in a transaction known as "CNHI II." The asset purchase agreement allocated $3 million of the purchase price to non-competition agreements for International ($2.25 million) and Inc. ($750,-000).[22] By its own terms, the CNHI II asset sale agreement did not call for any non-competition agreements to individuals.

Yet, the closing documents were altered to make $9.5 million in non-competition payments to Black, Radler, Atkinson, and Boultbee. A non-competition agreement to that effect was purportedly entered into between Inc., International, those individuals, and the purchaser of the assets on November 1, 2000.[23] Of the $9.5 million, Black and Radler each received $4.3 million. Mark Kipnis, International's Secre-

---

18. *Id.*

19. JX 127 (emphasis added).

20. JX 132 (emphasis added).

21. Inc.'s co-COO, Peter White, stated that Inc. "conducts no business." White Dep. at 146.

22. JX 9 at 3.

23. JX 10.

tary and General Counsel, signed the non-competition agreement on International's behalf. Kipnis also signed for Inc.—even though he had no office there—and for the individuals.

The second round of payments occurred in February 2001. By checks issued in February 2001 but backdated to December 31, 2000, a total of $5.5 million was paid to Black, Radler, Atkinson, and Boultbee. Again, Black and Radler got the lion's share, taking home $2.6125 million each. Unlike the CNHI II payments, for these payments the Special Committee could not even identify a purchaser of assets to whom a non-competition commitment ran. Rather, Black, Radler, Atkinson, and Boultbee signed an agreement not to compete with one of International's own wholly owned subsidiaries, American Publishing Company—a subsidiary that had very minor operating assets. Like the checks they received, the non-competition agreement these executives signed was backdated to December 31, 2000. Kipnis executed the agreements on behalf of International's subsidiary, which was securing the right not to suffer competition from the key executives of its corporate owner.

The last payments were made in April 2001. These payments—consisting of $600,000, with $285,000 going to each of Black and Radler—were characterized as non-compete fees charged against reserves from two asset sales in autumn 2000 to Paxton Communications and Forum. Again, these non-competition payments were not part of the asset sales agreements. Notably, in the case of these payments, Black, Radler, Atkinson, and Boultbee never even entered into a non-competition agreement with either Paxton or Forum.

Furthermore, the Special Committee was unable to find any evidence in the corporate minute book, or through other sources, that any of the non-competition payments had been the subject of specific approval by either International's audit committee or its board of directors. This was especially disturbing because International's annual reports for 2001 and 2002 had included the following language:

In connection with the sales of United States newspaper properties in 2000, to satisfy a closing condition, the Company [International], Lord Black and three senior executives entered into non-competition agreements with the purchasers pursuant to which each agreed not to compete directly or indirectly in the United States with the United States businesses sold to the purchasers for a fixed period, subject to certain limited exceptions, for aggregate consideration paid in 2001 of $600,000. These amounts were in addition to aggregate consideration paid in respect of these non-competition agreements in 2000 of $15,000,000. Such amounts were paid to Lord Black and the three senior executives. The Company's independent directors have approved the terms of these payments.[24]

The Special Committee was concerned that these statements were false in many respects and that they therefore needed immediate correction. These disclosures omitted any reference to the $16.55 million in non-competes payments made to Inc. The Special Committee could not find any proper board authorization for these payments, either. The Special Committee brought all of its preliminary findings to the attention of International's audit committee so that the two committees could confer on what should be done. This was appropriate given the audit committee's

---

24. JX 23 at F–14 (International 2001 10–K); JX 31 at F–24 (International 2002 10–K).

role in connection with the company's public filings and the approval of related-party transactions. Contrary to the defendants' assertions, the audit committee and Special Committee never functioned as a single unit.

What was done jointly was the transmittal of a letter to each of the executives who had received non-competition payments from Paris, Chairman of the Special Committee, and James Thompson, Chairman of the audit committee. The letter detailed the payments in question, and included the statement:

> As representatives of KPMG, [International's] external auditors, have already advised you, neither the payments to [Inc.] nor the payments to the Officers were approved by [International's] Audit Committee or its Board of Directors according to the minutes of relevant meetings. To date we are not aware of any other form of proper authorization for the transfer of these funds out of [International].[25]

The letter went on to ask each of the executives who received non-compete payments to detail the circumstances of each payment's approval and to provide evidence of proper approval. Due to the concern that the Special Committee had uncovered evidence that International had made materially misleading disclosures in its financial statements, Paris and Thompson asked for a rapid response, by November 10, 2003.

The November 6 letter was not the first time Black or the other executives learned of the urgency of the Special Committee's concerns. Since late October, Black had caused his management subordinates (including Radler, Atkinson, Boultbee, and

Kipnis) to research the approval process for the non-competes. Black also engaged Jesse Finkelstein of Richards, Layton & Finger to assist him. The earlier Tweedy Browne letters had also given him several months' notice of these issues.

In a November 10, 2003 letter largely drafted by Black based on research by he and his subordinates,[26] Finkelstein responded to the Special Committee's inquiry at length. By its own terms, the response was the product of "extensive research."[27] In the letter, Finkelstein recounts Black's memories of the payments and points out, among other things, that: 1) notes existed from KPMG staff indicating approval of the payments by the audit committees of both International and Inc.; 2) the public filings of International had made the disclosure set forth above; and 3) that those disclosures had all been approved by the audit committee of International. The letter explains at length why Black believed that the non-compete payments were justifiable and that, at worst, the lack of any record of a formal approval of them in the corporate records must have been an oversight. As to the payments to Inc., Black acknowledged that they had not been referred to the audit committee of International but claimed that they were fair.

The Finkelstein letter closed with a few points Black wished to add. They were inspired in part by the effect that the non-compete issues were likely to have on both International and Inc., especially given that KPMG had indicated that it might decline to certify those companies' upcoming quarterly statements. The most important points were the following:

---

**25.** JX 137.

**26.** These included Radler, Atkinson, Boultbee & Kipnis.

**27.** JX 145.

Lord Black has been engaged in intensive negotiations for five months to resolve the *relatively minor liquidity problems* at [Inc.]. [Inc.] is technically a mutual fund and its shares must therefore be retractable [i.e., capable of being put to the company in exchange for cash], and the liquidity problems have been caused by retractions of Preferred shares. Fears of the possible implications of this corporate governance process have effectively prevented a satisfactory refinancing for [Inc.] alone from being arranged.

In the circumstances, *it is Lord Black's tentative conclusion that the best course of action is to seek the approval of the Hollinger International directors for a public announcement that the company will seek and will evaluate proposals for a range of financing alternatives at the Hollinger International level,* **including the sale of some or all assets, and including the solicitation of an offer for all Hollinger International shares, including those owned by [Inc.] itself** . . . .

. . . .

. . . *Selling the company he has worked to build up for more than 25 years would be a painful course for my client, but if the directors, including particularly the Special Committee, share his view that this may be the most uniformly equitable and satisfactory course, and will do their part to facilitate it, he would be prepared, speaking for the controlling shareholder [i.e., Inc.] to seek this resolution of the problems which are bedeviling both Hollinger companies* . . . . [28]

---

28. *Id.* (emphasis added).

29. JX 146.

The same day, Radler, through his counsel, also wrote Paris and Thompson.[29] In that letter, Radler's counsel took a position regarding the approval process for the non-competes similar to that of Black.[30]

### Black Sues For Peace And Simultaneously Begins Negotiations With The Barclays

By mid-November, Black was reeling from recent events. He recognized that he was vulnerable to a serious investigation not only from the Special Committee but from the Securities and Exchange Commission. He wanted to head off actions by the independent directors that would tend to elicit immediate SEC scrutiny and to take the steam out of the Special Committee process by focusing the independent directors on a strategic process involving International. Put simply, Black feared SEC scrutiny, and even a possible criminal investigation.

To blunt that threat, Black indicated that he wanted the International board to meet with Lazard Freres. Black had been discussing an engagement with Lazard for many months, although he was unspecific for which company. He now focused upon Lazard becoming International's financial advisor for a wide-ranging strategic process in keeping with Mr. Finkelstein's November 10 letter.

Simultaneously, Black did what he had previously and adamantly refused to do: **HE REACHED OUT TO THE BARCLAYS.** On November 11—the day after he wrote back to the Special Committee through counsel—Black—who had just rebuffed David Barclay on November 3—

---

30. Black reviewed Radler's letter shortly after signing the Restructuring Proposal discussed below. Black did not renege on the Proposal after reading that letter.

informed David Barclay that he had a "thought worthy of discussion." [31]

### Black And The Independent Directors Forge A Restructuring Agreement

Black was invited to a meeting in International's offices in New York on November 13 by Thompson and Paris. He claims to have been surprised to find Breeden, the Special Committee's advisor, and James McDonough, a lawyer for International's audit committee, present. At the time of the meeting, however, David Boies and another lawyer from his firm happened to be present at International's office, although they did not attend the meeting.

According to Black, the independent directors and their advisors presented him with a severe list of demands that included a requirement that he repay the non-compete monies he had received, that he endeavor to cause Inc. to do the same, and that he resign as CEO. In addition, the independent directors took Black up on his suggestion of a "Strategic Process" and agreed to include that in a compromise, with a binding commitment from Black to support the process.

In the course of these discussions, Black asserts that he was told by Paris and Thompson that their investigation into the payments was virtually complete and that there was no other possible construction of the evidence than that the non-competes had not been properly authorized. According to Black's submissions in this case, he was overborne by his adversaries' demands and unable to resist accepting their construction of the evidence.

This claim, however, is unpersuasive. Black is a sophisticated man, who knows how to bring a lawyer into a room when he needs one, especially when a highly skilled advocate is waiting in the other room at the ready. Nor is Black a meek man, easily intimidated by others. The contrary is true. And the idea that he blindly relied on the construction of the record given to him by Thompson, Paris, Breeden and McDonough—that is, their opinion—is belied by Mr. Finkelstein's extensive November 10 letter arguing a different interpretation and other evidence regarding Black's views of the matter.

More likely is that Black recognized that the evidence that the Special Committee had unearthed was, on its face, highly disturbing and probative of violations of fiduciary duty and of the federal securities laws. That is, Black objectively faced circumstances in which his room for maneuvering was somewhat limited. In the face of those circumstances, Black bargained hard.

From the meeting emerged a general outline of an agreement. The parties left the meeting and had dinner together at *Le Cirque*. Throughout the course of the next few days, they (with the help of advisors) worked out the terms of a written agreement. During this process, Black had access to and utilized legal and financial advisors, including Boies. One key sticking point during that process involved the extent to which Black was bound to participate in the strategic process, both as an active participant and by refraining from engaging in transactions at the Inc. level that would interfere with that process.

Black made clear that he could not give a commitment to refrain from all transactions at the Inc. level because he owed fiduciary duties to that company. But he also made clear that Inc. was fundamentally healthy and that it only faced some

---

**31.** JX 148.

relatively modest liquidity issues. He wanted the flexibility to engage in transactions at the Inc. level if they were needed to address those issues. At the same time, Black stressed to Paris and the other International participants that he was committed to causing International to find a transaction that would be for the "equal and ratable" benefit of all International's shareholders and that he would not favor Inc. over the public stockholders of International.[32]

Therefore, the parties focused on a solution that would require Black to refrain from transactions at the Inc. level unless necessary to deal with certain defined financial circumstances. Even in that event, Black was required to give reasonable prior notice of any proposed transaction. Coloring all of these issues was an agreement that Black would continue to serve as International Chairman and devote the major part of his time and energy to International's strategic process.

By November 15, 2003, the parties reached accord on a specific written agreement. In general terms, that agreement required:

- Termination of the management agreement with Ravelston on June 1, 2004.
- Negotiation of an interim management fee with Ravelston for the first half of 2004. The fee was to be reduced to address other changes contained in the agreement. But International also agreed to consider pre-paying some of the fees to help Inc. with any short-term liquidity issues.
- The continuation of the Special Committee investigation.
- The repayment of the non-compete payments by Black, Radler, Atkinson,

and Boultbee on a defined schedule, with 10% due on December 31, 2003.

- That the Special Committee would entertain proposals from Inc. for repayment of the non-compete payments it had received from International, with the proviso that the payments must be returned in full by June 1, 2004. (This soft language reflected Black's personal assurances that he could ensure that Inc. would repay the monies in accordance with the agreement.)

- A statement that the non-compete payments to the individuals and Inc. "were not properly authorized on behalf" of International.

- A commitment by International to make corrective disclosures of public filings relating to the non-competes that were "incomplete or inaccurate." The audit committee and Special Committee were to have final approval, but Black got to review and comment on the proposed corrections.

- Paris, as interim CEO, and Black, as Chairman, were to develop a policy for corporate aircraft, which were to be "restricted solely to business purposes."[33]

Additionally, the Restructuring Proposal instituted certain changes in the makeup of International's management and board:

- Radler was to resign all his positions with International and its affiliates, including as a director of International.

- Boultbee was to resign from his offices at International.

- Atkinson was to be phased out as an officer and to resign as a director of International.

---

**32.** Trial Tr. at 342 (statement of Seitz); Trial Tr. at 466 (statement of Breeden).

**33.** JX 169.

- Kipnis was to resign immediately as an officer and employee of International.
- Black was to retire as CEO but remain as Chairman "to pursue the Strategic Process" and as Chairman of the Telegraph Group.
- As noted, Paris was to be appointed interim CEO.
- Daniel Colson was named COO to replace Radler.
- The Executive Committee was reconstituted and Seitz was made its Chairman. Black remained on the Committee.

The provisions of the agreement that address the Strategic Process most directly are set forth in ¶¶ 6 and 7 of the Proposal. They are important and bear recitation in full:

6. The full Board of Directors will engage Lazard as financial advisor to pursue a range of alternative strategic transactions ("Strategic Process"). *The Chairman of the Company will devote his principal time and energy to pursuing the Strategic Process with the advice and consent of the Executive Committee and overall control by the Board.* Lazard will be directed to give regular reports of progress and developments in the Strategic Process to Lord Black and Gordon Paris; in addition, Lazard will be directed to give periodic reports to the Company's Executive Committee or upon request of the Executive Committee.[34]

7. *During the pendency of the Strategic Process, in his capacity as the majority stockholder of HLG [i.e., Inc.], Lord Black will not support a transaction involving ownership interests in HLG if such transaction would negatively affect the Company's ability to consummate a transaction resulting from the Strategic Process unless the HLG transaction is necessary to enable HLG to avoid a material default or insolvency. In any such event, Lord Black shall give the Company as much advance notice as reasonably possible of any such proposed HLG transaction.*[35]

The parties to the Restructuring Proposal had premised the agreement on an understanding that the Strategic Process and the Special Committee's work would take several months to complete. The hope was that those processes could be completed by June 1, 2004. Black understood that this was the contemplated time frame.[36]

In shaping this schedule, the independent directors relied on, among other things, Black's assurances that Ravelston and Inc. were fundamentally strong companies and that Inc. had some relatively minor liquidity issues. Given those representations and Black's agreement to devote his principal attention to the Strategic Process and to refrain from an Inc. transaction except in discrete circumstances and even then only after reasonable prior notice, the individual directors believed that International could take the time necessary to market itself and its assets to a wide array of possible buyers in an orderly and informed manner, rather than in a fire sale.

Moreover, a key aspect of the Restructuring Proposal was that the Strategic Process would be conducted with "overall

---

34. *Id.* ¶ 6 (emphasis added).

35. *Id.* ¶ 7 (emphasis added).

36. Black points to a Lazard presentation that optimistically indicated that a strategic transaction could be consummated by March 2004. Black knew this was an estimate and that a more likely completion date was June 2004.

control" by a newly reconstituted board including a solid majority of independent directors. *That is, by its terms, the Restructuring Proposal had removed two inside directors from the board, leaving a firm independent majority.*

On November 17, 2003, International publicly announced the key features of the Restructuring Proposal. Black reviewed and participated in crafting the release. The release stated that, among other things:

> Hollinger International Inc. ("Hollinger") . . . today announced that its board of directors has retained Lazard LLC ("Lazard") to review and evaluate its strategic alternatives, including a possible sale of the company, a sale of one or more of its major properties or other possible transactions (the "Strategic Process").

> In addition to commencing the Strategic Process, Hollinger also announced a series of management changes. *Lord Conrad M. Black of Crossharbour ("Lord Black") has advised the board that,* in light of the Strategic Process, he will retire as Chief Executive Officer effective November 21, 2003, and that *he will devote his time and attention primarily to pursuing the Strategic Process.* Lord Black will remain as non-executive Chairman of Hollinger, and he will continue unchanged his role as Chairman of The Telegraph Group, Ltd. (the "Telegraph"), a wholly-owned subsidiary of Hollinger.

> *Lord Black said: "Now is the appropriate time to explore strategic opportunities to maximize value for all shareholders of Hollinger International.* We are delighted that Bruce Wasserstein and his team at Lazard will be working with us to ensure the market is well aware of the substantial value of the Company's assets. *Reflecting my full support of this process, I will be devoting my attention in coming months to achieving a successful outcome for all Hollinger shareholders.* The present structure of the group clearly must be renovated. As the Strategic Process proceeds we will continue to cooperate entirely with the Special Committee to resolve corporate governance concerns."

> . . . .

> Lord Black has also agreed that during the pendency of the Strategic Process, in his capacity as the majority shareholder of HLG, he will not support a transaction involving ownership interests in HLG if such transaction would negatively affect Hollinger's ability to consummate a transaction resulting from the Strategic Process unless any such transaction involving HLG meets certain limited conditions, and after reasonable prior notice to Hollinger.[37]

As Black had desired, neither the Restructuring Proposal nor the press release indicated that he had engaged in any wrong-doing in connection with the non-compete payments. Rather, these documents simply relied on the lack of proper authorization for the payments as a justification for the action taken, relieving Black and the other recipients of the burden of being accused of conscious self-enrichment at the expense of International. This wording was as Black wished, as it tended to assuage, rather than inflame, government regulators.

### The Inc. Independent Directors Revolt—Then Resign

The events at the International level soon drew interest from Inc.'s four independent directors—who formed that com-

37. JX 184 (emphasis added).

pany's audit committee—and its auditors, KPMG. After performing its own inquiry into the non-compete payments, the Inc. audit committee presented a report to the full Inc. board on November 19, 2003 that included various recommendations.[38] Among other things, the Inc. audit committee recommended that Black, Radler, and Boultbee immediately resign from their management positions at Inc., and that Atkinson, Boultbee, and Radler resign from Inc.'s board of directors. On November 21, 2003, the five non-independent directors voted against taking these actions, over the objection of all four independent directors. The independent directors promptly resigned from the Inc. board.[39]

### Black Immediately Begins To Violate The Restructuring Proposal

When Black signed the Restructuring Proposal, he knew that that contract was intended to bind him at least until the end of the Strategic Process. Notwithstanding his assertion at trial that he expected the Strategic process to be a rapid one, Black also knew that the Strategic Process was likely to take until June of 2004 to complete and that International intended to bring the Special Committee and Strategic Process to completion at or around the same time.[40] This time frame was a sensible one given the tasks involved in both endeavors. Focusing specifically on the Strategic Process, Black understood that International was a complicated company from a tax perspective and that it took time to prepare offering materials, a data room, and the other information necessary to market the company and its assets to a wide array of buyers, thus guaranteeing that International's stockholders—including Inc.—benefited from a thorough market search for the highest price.

Indeed, on November 16, 2003, Black provided a report to the Inc. board regarding the Restructuring Proposal. In that report, he focused the Inc. board on June 1, 2004 as the target date that Inc. needed to weather in terms of cash flow because that was the date about which the Strategic Process was expected to end.[41] In keeping with this understanding, Black's close friend and long-time business partner, Peter White, who is an Inc. and Ravelston officer and director, referred a potential buyer of a newspaper owned by International to Lazard on December 5, 2003 and told the buyer that the Strategic Process "will take some time."[42]

Knowing that International's time frame for the Strategic Process was not an expedited one and knowing that the International board was relying upon the contractual commitments he had made in ¶¶ 6 and 7 of the Restructuring Proposal, Black used this breathing room to pursue transactions in violation of the Restructuring Proposal.[43] Most notably, on November

38. JX 194.

39. JX 207.

40. For example, in an email from Black to Boultbee on Nov. 14, 2003, Black wrote "Breeden says he intends to finish his process by June 1." JX 159.

41. JX 178 at 2. In that same meeting, Black apparently stressed his obligations to the Strategic Process but with a greater emphasis on the flexibility that Inc. retained than the Restructuring Proposal's own terms warrant-

ed. During the meeting, Black was asked if he would help Inc. with its financial needs. He demurred and pointed to other options.

42. JX 265.

43. Black's conduct was questionable in other respects. For example, the press release announcing the Restructuring Proposal said that Black would resign as CEO on November 21, 2003. This would have given Black time to sign the company's 10–Q for the previous quarter. Instead, Black resigned early, put-

17, 2003, Black began to turn the Barclays away from their interest in a direct purchase of The Daily Telegraph and towards a purchase of Inc. Black protests this inference, pointing to a letter he sent to Aidan Barclay on November 18, 2003, which stated:

> This [referring to an offering memorandum seeking a $150 million investment in Inc. which he enclosed] is one way to proceed. If you want to buy all of Hollinger Inc. and therefore control of Hollinger International and the Telegraph, we can talk about it. If you want to look exclusively at the Telegraph, Lazard will be calling you.[44]

Black and the other defendants cite this as evidence of good faith by Black towards the Strategic Process. And it appears to be true that Black mentioned the Barclays to Lazard in mid-November as one of the potential buyers that International should contact in the Strategic Process.

The inference that arises from this letter, when considered in the context of all the evidence, however, is quite different than the one defendants wish to me to draw. What emerges is that Black let the Barclays know that if they wanted to achieve control of the Telegraph in the near-term, without facing competition from other bidders, then they had to deal through Black, outside of the Strategic Process.

As Black well knew, the Strategic Process was to be an extensive market canvass without artificial time constraints, with a hoped-for resolution by June 2004. When the Barclays contacted Lazard, their interest was noted and they were informed that they would be included in the Strategic Process. But they also knew from that contact that they would not be the only bidder. Moreover, when the Barclays contacted Lazard they did not, as shall be discussed further, disclose their contacts with Black. Nor did they make any pre-emptive move as the defendants suggest. A pre-emptive move would have involved an offer at an attractive price for either the Telegraph or International as a whole. The Barclays never made a move of this kind.

It is notable that in his letter, Black suggests that if the Barclays wished to discuss gaining control of International, he could discuss that with them. Of course, Black had pledged publicly that he was devoting his principal time and energy to a process seeking to maximize value at International, including through a possible sale of the company as a whole or some of its assets. A transaction whereby the Barclays would gain control of International was clearly within the scope of the Strategic Process.

Stated bluntly, Black steered the Barclays toward doing an end-run around the Strategic Process, knowing that his contractual assurances in ¶¶ 6 and 7 gave the International board a false sense that they had the time for adequate deliberation. Black's assurances that Inc. and Ravelston faced only relatively minor liquidity issues and that the press reports of more dire straits were false also contributed to this sense. As we shall see later, Black now claims that Inc. was nearly insolvent by this time period. Not only is that not true, Black vociferously denied that it was so during this period.[45]

---

ting Paris in the awkward position of playing catch-up and having to sign the 10–Q.

**44.** JX 190.

**45.** Admittedly, there is evidence that International's advisor, Lazard, knew that Inc. was exploring its financing options and knew of press reports to the effect that Inc. was under financial stress. But Lazard and its client,

On November 20, 2003, Black took further steps to direct the Barclays towards a purchase of Inc. as a method of acquiring control of International. That day, he specifically proposed that the Barclays purchase Inc. and indicated what value he would be looking to receive for the equity of Inc. and that he wanted a $10 million "redundancy" (i.e., managerial severance) package for himself.[46] In this communication, Black expressly based his proposal on a range "of value of Hollinger International, (HII) according to Lazard's opening document, [which] is $18 to $24 per share."[47] Stated simply, Black used confidential advice given to him in his official capacity at International to negotiate behind International's back with the Barclays. The Lazard numbers were prepared in part using non-public information it had received from International.[48] In this litigation, other non-public financial information about International was produced from the files of the Barclays.[49] The inference is inescapable that this information was provided to the Barclays by Black or agents working under his direction.[50]

Throughout the course of November and December, Black continued to negotiate with the Barclays. During this process, he felt free to and did communicate to the Barclays information about International that was not publicly available and that was sensitive. This included information about the pace of the Strategic Process and Lazard's financial analysis. For example, on November 22, 2003, Black provided the Barclays, in a negotiating document, with a refined Lazard range of $18.71 to $24.63 for International, and described some of the assumptions that went into that range.[51]

During this time period, the Barclays were anxious to communicate directly with International. Black was equally anxious to prevent them from doing so.[52] The Barclays' conduct during this and later periods was, to put it mildly, highly pragmatic. In many communications, the Bar-

---

International, also had been assured by Black that the press reports were overstated, that Inc.'s problems were minor, that Ravelston was rich, and that he would abide by ¶¶ 6 and 7 of the Restructuring Proposal.

**46.** JX 197.

**47.** *Id.*

**48.** Lazard's analysis, while based largely on publicly available data, was based in part on its own EBITDA multiples and on at least some confidential management estimates provided to Lazard by International. Lazard also received non-public information about International from Inc.'s financial advisor, Westwind, which it used in preparing its analysis. )Earlier, Black had given Westwind confidential, non-public information about International. He claimed that as International's CEO, he was authorized to use International's non-public information for the benefit of Inc. without informing the International board.) Black then turned over to the Barclays the valuation of International that La-

zard prepared for the International board for use in the Strategic Process.

**49.** *E.g.,* JX 328.

**50.** Black claims that the Lazard value range was not material. I find that incredible as it was important bargaining information.

**51.** JX 496. Consistent with his pattern and practice, Black also had Daniel Colson, International's COO, provide the Barclays with information about a key contractual arrangement involving an asset of the Telegraph. Neither Colson nor Black informed the International board or Lazard of their conduct. Indeed, even Aidan Barclay stated that he "was very surprised that Dan Colson seemed to know a lot of what was going on, because Conrad Black obviously discussed a lot of things with him." A. Barclay Dep. at 51.

**52.** *See* A. Barclay Dep. at 90 (Aidan Barclay stating that Barclays wanted to speak with International but Black "put us off").

clays inclined the negotiations toward International, stressing their flexibility and willingness to do a deal with International, to buy the International shares owned by Inc., to buy the Telegraph, or to do a deal with Inc. and International simultaneously. Of greatest concern to the Barclays, however, was procuring control of The Daily Telegraph—which David Barclay viewed as a "once in a lifetime opportunity." [53] They felt Black wielded the ultimate power over that asset regardless of the fact that it was owned by International. The Barclays viewed gaining control of International through a deal with Black as a "means to an end," [54] the end being ownership of the Telegraph. Thus, one of their chief concerns was to make sure that they could guarantee that they would end up controlling the Telegraph if they did a deal with Black without the International board's prior consent. This fear was rational because the Telegraph is, the Barclays' counsel believed, unlikely to constitute substantially all the assets of International. As a result, the International board could dispose of that asset without a stockholder vote, which would make a purchase of Inc., in David Barclay's view, a "high risk." [55] Black assured the Barclays that this fear could be addressed by consummating a deal with him and then presenting International with a "fait accompli." [56]

Of course, at this time, Black was supposed to be devoting his principal time and energy to direct the International Strategic Process in order to maximize the value of the Telegraph and other assets owned by International for all International stockholders. Instead, he devoted his principal energy to crafting methods by which he could sell Inc. to the Barclays and assure them that they would be able to stymie any sale of the Telegraph by International's board.[57]

Similarly, when the Barclays got wind of the Restructuring Proposal, they harbored grave concerns that Black was violating that Proposal and could not deliver the deal he had proposed.[58] Again, Black devoted his efforts to convincing the Barclays that they could get around the Proposal.

In this litigation, the Barclays have portrayed themselves as innocents, who have tried to do right by all. As noted, they, along with Black and Inc., have stressed that the Barclays were in contact with Lazard during this period and had registered an interest in the Telegraph and International with Lazard.

But this expression of interest was unaccompanied by the kind of candor necessary for me to draw the inference of highly honorable conduct that the Barclays desire. The Barclays knew that they were concealing from Lazard extremely important information that was necessary for Lazard to respond to their interest effectively on behalf of International. From Lazard's perspective, it was obviously great news that the Barclays were interested. Lazard felt under no compunction

53. F. Barclay Dep. at 16–17, 30; A. Barclay Dep. at 116.

54. F. Barclay Dep. at 30.

55. JX 213.

56. JX 394.

57. For example, Black advised the Barclays how they could prevent the International board from selling the Telegraph after a purchase of Inc.: "I assume you would move at once to assert your control over the board and it will be impossible to sell the Telegraph or any other important asset before whatever reconstruction of the board you required was effected." JX 212.

58. JX 248.

to put the Strategic Process into emergency mode, however, because International had procured contractual guarantees that Black would put his principal energy into the Strategic Process and refrain from Inc.-level transactions except under narrowly specified conditions and only then with proper notice. With this understanding, Lazard could proceed with a process designed to attract several bidders over a responsible time frame.

The Barclays knew that this was Lazard's understanding. Yet, they purposely remained silent and did not inform Lazard (or anyone at International) that they were negotiating with Black. That silence also included a failure to inform International that the Barclays' expression of interest in buying the Telegraph had been diverted by Black into a negotiation to buy (all or part of) Inc. or its International's shares.

### Black Assures The International Board That He Was Not Violating The Restructuring Proposal

During the post-Restructuring Proposal period, Black was not just playing footsie with the Barclays. He also engaged in discussions with Hicks, Muse, Tate & Furst. Daniel Colson, an International director and its COO, gave Hicks, Muse a tour of International's Chicago operations without informing Paris or Lazard. During this period, Black shared information about his dealings with the Barclays with Colson, but Colson did not tell the other International directors. Black also discussed deals with Triarc Corp. and later sent them confidential materials from a presentation made to the International board. At all times, Black felt free to share confidential information from International with whomever he wished, without authority from the International board, and for purposes of discussing transactions outside of the scope of the Strategic Process to which he was supposed to be devoting his principal energy.

In this case, Black has complained that he was not included within the Strategic Process as contemplated by the Restructuring Proposal. That accusation is not borne out by the record. It appears that Black was included in the Process by Lazard in the manner that would be expected at the early stages of it. Black and Paris were treated equally in the Process by Lazard. Had Black in fact devoted his principal energy to the Strategic Process and brought the Barclays opportunity to International early, with full candor, urgently, and aggressively there is little doubt that the Process would have moved much faster. But he did not and did nothing to indicate to the International board that the previously understood time frame was no longer acceptable.

To the contrary, when Black was confronted with concerns that he was possibly violating the Restructuring Proposal at a December 17, 2003 International Executive Committee meeting about the Strategic Process, he made assurances to the Committee that he wanted recorded in the minutes. The minutes read as follows:

> Lord Black, in response to Mr. Wasserstein's remarks, then requested that the minutes of the meeting reflect that he wished to go on record stating to the Committee that:
>
> (i) Lord Black understood that the negotiations taking place at the "parent level" were a matter of concern to the Company;
>
> (ii) neither Lord Black nor Hollinger Inc. have solicited any inquiries from potential acquirors or other sources of capital;
>
> (iii) Hicks, Muse, Tate & Furst ("*Hicks Muse*") initially made overtures to Hollinger Inc. regarding a potential offer for all of the shares of both

Hollinger Inc. and the Company; however, once Hicks Muse's offer changed to include only the interests of Hollinger Inc., Lord Black instructed Hicks Muse to join the queue of the strategic process run by Lazard;

(iv) Lord Black has been faithful to the Lazard process and has done nothing to disturb the Lazard process;

(v) Lord Black acknowledged that Hollinger Inc. has liquidity issues and that he must be mindful of those; however, he will not favor Hollinger Inc. over Hollinger International Inc.[59]

Black's statements were, of course, largely false and can only be reasonably construed as being intended to mislead his fellow directors and to convince them that he was being faithful to the Restructuring Proposal when in fact he was not. The only reasonable reading of his remarks is that he was assuring his fellow directors that he was not trying to do a deal involving the sale of Inc., and to quell their fears about rumors to that effect. In this same time period, Black also assured director Seitz that Inc.'s financial condition was not dire and that it could handle its upcoming financial obligations.[60] This assurance was in keeping with his previous representations that Inc.'s liquidity problems were relatively minor.

### Black Takes The Fifth And Fails to Repay The First 10% Of The Non–Competes

In late December, Black was questioned by the SEC about matters within the scope of the Special Committee's investigation, including the non-competes. He invoked the Federal Constitution's privilege against self-incrimination and refused to cooperate. Specifically, Black refused to answer any questions regarding the non-competes on the ground that his answers might incriminate him. By doing so, he denied the SEC the full cooperation of International that had been promised when the Restructuring Proposal was announced in November.

Black also began steps to repudiate his commitment to repay the monies due back to International under the Restructuring Proposal. In his negotiations with the Barclays, the Barclays had been open to guaranteeing repayment to International of the sums Inc., Black, and others were expected to pay. In late December, however, Black informed the Barclays that repayment may not be due. When his obligation to repay International 10% of the total sum owed came due on December 31, 2003, Black did not pay and thereby breached the literal words of the Restructuring Proposal. All of the other individuals who had promised to make payments (i.e., Radler, Atkinson, and Boultbee) did so.

As of this time, Black had also failed to respond to International's attempt to renegotiate the Ravelston management contract through June 1, 2004. Although he complains that International made a lowball offer, the offer was much lower because Ravelston's costs of delivering services to International had been greatly reduced and because the previous profit margin on the contract was quite large.

---

59. JX 291.

60. Seitz credibly testified about this. *See also* JX 297 (Seitz's contemporaneous e-mail re: Black's statements that "Inc. has other resources and people shouldn't think it would 'crater' at the first deadline" of March 1,

2004). The other directors had often been assured by Black that Inc.'s need to pay the upcoming interest payment was a minor problem given the resources Inc., Ravelston, and Black had at their disposal. *E.g.,* Savage Dep. at 66.

Black also now complains that Ravelston was cash-strapped and could not meet its obligations to Inc. without payments from International. At the relevant time, however, Black made no efforts to negotiate seriously with International in order to address Inc.'s liquidity needs.

Furthermore, to the extent that Black now attributes Inc.'s financial vulnerability to International's failure to pre-pay Ravelston management fees, as contemplated by the Restructuring Proposal, that argument lacks force for the same reason. Black did not undertake good-faith negotiations over that issue, nor did he ask the International board to help Inc. meet its financial needs until the completion of the Strategic Process.

### The International Board First Considers A Rights Plan

When Black did not make his contractually required payment and when rumors of his violations of ¶¶ 6 and 7 of the Restructuring Proposal persisted, the International board members began to consider their options to protect the company and its stockholders. Among the options that began to be explored was the adoption of a shareholder rights plan that would enable the board to protect the company's plan of completing the Strategic Process and the Special Committee process, before settling on a specific transactional or business strategy. Black was aware of the possibility that a poison pill might be adopted to thwart a deal with the Barclays because the Barclays' counsel at Skadden, Arps, Slate, Meagher & Flom had advised the Barclays in December that the International board would likely consider such a move to protect the company's public stockholders. The Barclays had informed Black of this advice and Black had been considering ways to counter that threat since.

In early January, Black and the other International directors received a briefing about a shareholder rights plan. Black responded in two ways. First, he communicated the confidential advice provided to the International board to both the Barclays and to Triarc—without permission from the International board. Second, he called director Kissinger and threatened to remove the International board if it adopted a rights plan.

Negotiations then ensued between Black and his legal advisors at Sullivan & Cromwell, on the one hand, and the International board, through its advisors, on the other. During this process, Black threatened to sue the directors on the Special Committee and audit committee, mentioning that he knew where directors Seitz and Savage had personal assets that he could seize.

Black and International negotiated a rough standstill agreement that also gave Black some more time to make his repayment, without prejudice to any rights the parties already possessed, including the rights International held under the Restructuring Proposal. International pressed for a standstill preventing Black from negotiating with other parties. Black would not agree to that but did not procure any modification of the Restructuring Proposal that alleviated his duties under ¶¶ 6 and 7 or any other provision of that contract.

By early January, Black's negotiations with the Barclays were well along and they had settled on a sale of Inc.—Black having dissuaded the Barclays from pursuing any deal with International directly or from purchasing Inc.'s International shares. Notably, the latter form of transaction, which the Barclays had suggested, would have, because of the Tag–Along Provision in International's charter, left International without a controlling stockholder (unless

accomplished as part of a Permitted Transaction) and would have had less effect on the Strategic Process.

Even so, Black and the Barclays continued to conceal their dealings from International. During the standstill period, Black made some proposals to International to resolve the simmering dispute. These included the possibility of International buying Inc. and other similar constructs. None of these deals could feasibly have been completed within the period of the rough standstill, which, in its last period, ran from January 4 until January 18, 2004. Also, a deal of this kind would largely have pre-empted the Strategic Process and inherently involved a negotiation of claims still being examined by the Special Committee.

### The Final Break–Down

Near the end of the standstill period, events accelerated. Although Black purported to be trying to do a deal with International, the evidence suggests that his central focus remained on consummating the deal with the Barclays and presenting the International board with a "fait accompli." By early January, Black had desired to suspend the standstill and proceed with the Barclays Transactions but his advisors no doubt informed him that was not possible. Therefore, Black focused on being able to rollout a sale of Inc. to the Barclays immediately at the end of the standstill period.

Meanwhile, International's independent directors were also busy. By this time, the Special Committee had concluded that a lawsuit ought to be brought against Black and others for self-dealing. They filed that suit on January 16, 2004. Soon

thereafter, Black threatened the independent directors with a defamation suit.[61]

The SEC had also threatened suit against the company for securities law violations in connection with the non-competes and other matters. The SEC gave the company an imminent take-it-or-leave it choice of being sued by the federal government for securities fraud or cooperating by entering a stipulated consent order ("the Consent Order"). Paris, as company CEO, agreed to sign the Consent Order, which was entered by the United States District Court for the Northern District of Illinois on January 16, 2004. Hastily called meetings of the International audit, Special, and Executive Committees were held to ratify that action. The directors who ratified Paris's decision to sign were advised of the Order's terms by counsel but did not have much time to consider its actual provisions.

In view of the SEC's demand for a prompt response, it is not easy to consider the board's level of informedness grossly inadequate, but it was certainly not ideal.

By its terms, the Consent Order largely focuses on committing International to allow its Special Committee to complete its work without interference. To that end, the Consent Order provides for the appointment of a "Special Monitor" upon certain triggering events (such as the election of new directors without the support of 80% of the incumbent directors) intended to ensure that the stockholders could not impede the Special Committee investigation by replacing the board. Should a triggering event occur, the powers of the Special Committee to prosecute actions on behalf of the company, obtain information, and have resources to do its work would vest in the Special Monitor, who would be

---

61. Black recently honored that promise by suing several of the independent directors in Canada, and had process served on one of them, Savage, during his deposition in this case.

the Special Committee's advisor, Richard Breeden. By its own terms, the Consent Order is intended for a time-limited purpose. Once the Special Committee has certified to the court that it has completed its work, the Special Monitor provisions are to expire. Moreover, the Consent Order contemplates a report by the Special Committee within 120 days, subject to reasonable extensions.

Upon the appointment of a Special Monitor, the Special Monitor is also charged with preventing the dissipation of International's assets and protecting the interests of the non-controlling shareholders of the company "to the extent permitted by law."[62] Although Black and Inc. contend otherwise, the Consent Order, by its own terms, does not suggest that the Special Monitor may unilaterally block transactions undertaken by the International board after a triggering event. What is clear is that the Special Monitor is empowered to investigate and litigate to prevent transactions if the Special Monitor believes they are wrongful or to seek other authority from the United States District Court.[63]

In this time frame, Lazard was also trying to accelerate the Strategic Process now that Black's infidelity to that Process was abundantly apparent. This concerned the Barclays, who wanted to prevent any sale of Telegraph assets.

On January 17, 2004, the International Executive Committee met. The Committee voted to remove Black as Chairman. Black asked for the reasons. The Committee declined to debate them with him. The record reveals that the Committee removed Black because he had refused to cooperate with the SEC (a failure that helped motivate the SEC's legal action), had violated the Restructuring Proposal in several respects, and had, in the Special Committee's view, engaged in additional breaches of fiduciary duty beyond the issues related to the non-competes. During the meetings in the preceding days, Black continued to conceal his dealings with the Barclays. By contrast, during that same period, Black freely shared with the Barclays confidential information about the International board's deliberations and the procession of the Strategic Process.[64]

On the evening of Saturday, January 17—i.e., after the Executive Committee meeting that day—Black faxed the following letter to International's empty offices:

> I am writing to inform Hollinger International Inc. that The Ravelston Corporation Limited and the undersigned intend tomorrow to enter into an agreement with Press Holdings International Limited, an English company, that will provide for Press Holdings to make an offer in Canada to purchase any and all of the outstanding common shares and preference shares of Hollinger Inc. and for Ravelston and the undersigned to tender all such common and preference shares held directly or indirectly by us into the Offer, all on the terms and conditions to be set forth in the agreement.
>
> Sincerely yours,
>
> Conrad M. Black[65]

This is the notice Black now claims complies with his obligations under ¶ 7 of the Restructuring Proposal.

---

62. JX 404 at 5.

63. Inc. is litigating in the U.S. District Court to lift the Consent Order. No direct challenge to that Order is presented in this case.

64. *E.g.,* JX 397. Black claims all his information about the process came from third parties and not International. I do not credit this claim.

65. JX 413.

*The Barclays Announce Their Deal With Black And Black Repudiates The Restructuring Proposal*

The transaction that Black struck with the Barclays ("the Barclays Transaction") involves an offer by the Barclays to purchase all of the equity of Inc. and to redeem certain of its preference shares, as well as an agreement by Black and Ravelston to support the offer. The implied value of International under the Barclays Transactions is below the bottom end of the Lazard ranges Black gave the Barclays.[66] The Inc. board played no role in crafting the agreement.

In the agreement, Black and Ravelston agreed to use their reasonable best efforts to ensure that Inc. and its subsidiaries— i.e., International—would not engage in certain transactions. These include the types of transactions to which the Strategic Process was primarily addressed, including:

- Any issuance of shares;
- Any material sale of assets;
- Any merger, liquidation, or business combination; and
- Any payment of dividends.[67]

Rather than guaranteeing International that it would receive the payments it was due under the Restructuring Proposal, the Barclays Transaction merely establishes an escrow of $16.5 million of payments that would otherwise go to Black and Ravelston. This escrow is to be the source of repayment by Inc. in the event that a judicial order is entered requiring it to repay the sums specifically addressed in the Restructuring Proposal. Of course,

Black had assured International that he would cause Inc. to repay those sums and Inc.'s resigning independent directors had made it clear that they wished Inc. to fulfill that assurance.

The same day, the Barclays sent a letter to the International board offering to meet with it and promising their support of the Strategic Process and the possible benefits to International of having the Barclays as controlling stockholders. The letter also suggested that they might cause Inc. to repay the non-competes once they were convinced that repayment was due.

Also on that day Black sent a letter to the International board repudiating the Restructuring Proposal. He claimed that he now possessed evidence that the non-competes might have been properly authorized and that he had not had access to that information when he signed the Proposal. As will be discussed later, those assertions were erroneous as Black continued to possess no evidence of proper approval and had or could have gained access to all of the material information by November 15, 2003 that he had on January 18, 2004. Black also accused International of breaching its obligations under the Proposal.

In his letter, Black nowhere argued that the Barclays Transaction was necessary to avoid a material default by, or the insolvency of, Inc. In fact, his contract with Barclays warranted that Inc. was solvent.

*The International Board Responds*

The International Board met on January 20, 2004 to address these events. It

---

66. Black claims, but has not proved, that Inc. is receiving a value tied to an implied value of approximately $17 per International share. In Zachary's deposition, he questioned that and believed that Inc. was getting a price nearer to an implied value of $18.75 per International share. For present purposes, it

suffices to note that this decision does not turn on the value of the Inc. deal and that the defendants did not put forward proof regarding its economic terms and the relationship of those terms to International's value.

67. JX 425 at 20 of 53.

formed a Corporate Review Committee ("CRC"), which was comprised of all directors other than Black, Mrs. Black, and Colson. The CRC was given broad authority to act for the company and to adopt such measures as a shareholder rights plan. Black and Mrs. Black were excluded for obvious reasons. Both were bound to the Barclays Transaction. And Colson is a Ravelston stockholder and had assisted Black in his dealings with the Barclays.

The CRC immediately focused on the company's options, including adopting a rights plan to protect the Strategic Process against the threat posed by the Barclays Transaction. Related integrally to this concern was the CRC's belief that the Barclays Transaction resulted from a material breach by Black of his obligations under ¶¶ 6 and 7 of the Restructuring Proposal. Rather than having the freedom and space to sell International or engage in other options at the end of a thorough and informed Strategic Process, International's board now faced having new controlling stockholders who did not acknowledge Inc.'s duty to repay the noncompetes and who were not open to a full range of strategic transactions—most notably one that would involve a sale of the whole company or any other option that would involve the Barclays' losing the "once in a lifetime opportunity" to control the Telegraph. The full board also adopted (over the objection of Black and his wife) a resolution clarifying and expanding the powers of the Special Committee to include, among other things, broader authority to initiate litigation and cooperate with governmental investigations.[68]

Meanwhile, the CRC, through Lazard, did engage in some discussions with the Barclays. The Barclays mentioned prices at the low end of Lazard's previous fairness range but never made a firm offer of any kind, as businessmen understand such matters. To this date, the Barclays have yet to communicate any kind of firm bid.

### Black And The Barclays Take Countermeasures

The Barclays feared the CRC and the Strategic Process. They were afraid a rights plan would be put in place that would prevent them from completing the Barclays Transaction without simultaneously losing the voting control they thought they were purchasing. They also feared that the International board would sell the Telegraph assets.

To chill the latter threat, Black fired off a letter to Paris threatening International's directors with liability if Lazard sent out confidential information about the Telegraph to possible buyers, irrespective of whether Lazard had procured confidentiality agreements, for any "competitive injury" that might result from the dissemination of that information.[69] Thus, Black—who felt free to distribute confidential information without permission and without procuring confidentiality protections—attempted to coerce International's independent directors not to take a step obviously contemplated by the Strategic Process he was bound to support. Despite their entreaties to the contrary, the Barclays supported Black's move as they wished to prevent any sale by International of the Telegraph.

Black also suggested an outrageous strategy whereby the Barclays would convince Lazard to betray their clients. He suggested to David Barclay that David tell Lazard's lead banker, Bruce Wasserstein, that "he would do a lot better waiting for

---

68. JX 443.

69. JX 449.

your [i.e., the Barclays'] next deal than trying to sabotage anything."[70]

*Black Causes Inc. To File A Written Consent Giving Him Personal Veto Power Over The Strategic Process*

The same day that he wanted the Barclays to convince Lazard to pull a Benedict Arnold, Black caused Inc. to file a written consent profoundly affecting the operation of the International board. That consent amended the bylaws of International to provide:

- Written notice of any meeting of the International board must be given at least seven days before the meeting.
- Any notice of a special meeting of the Board must include a statement of all business to be conducted at the meeting.
- Committees must provide directors at least 24–hours written notice of the committee meetings.
- Committees, other than the Special Committee, must provide a report of the substance of all actions taken at their meetings to the full Board within five days thereof.
- The presence of at least 80% of the directors is required to have a quorum at a meeting of the Board for the transaction of most business.
- A quorum of all of the directors holding office is required for the board to take action on certain "Special Board Matters," including, among other things, changing the number of directors or filling any vacancy on the board; approving a merger or a sale of all or substantially all of the assets of the company; approving a sale of assets having a value of more than $1 million; and amending or repealing any bylaw of the company.

- Unanimous assent of all directors is required for the approval of any Special Board Matter.
- The audit and Special Committees will remain in place, with all of the powers and authority given to those committees in the original board resolutions that created them, while all other committees of the Board are dissolved. *The effect of this particular provision was to abolish the CRC and strip the Special Committee of any added authority it was given in the January 20th board resolution.*
- New committees may be established only be a unanimous vote of the Board at a meeting at which all directors are present.

It is plain that these "Bylaw Amendments" fundamentally altered the power that the International independent directors possessed at the time the Restructuring Proposal was signed. At that time, Black, Mrs. Black, and Colson were only three of the eleven directors. While Inc. had the right as a stockholder to vote as it wished on transactions resulting from the Strategic Process, the independent board majority had the practical authority to shape the options, using the managerial authority vested in them by § 141 of the Delaware General Corporation Law ("DGCL").

After the Bylaw Amendments, Black could unilaterally block any material sale of assets, disable the board from adopting a shareholder rights plan, and prevent the signing of a merger agreement. That is, Inc. had taken steps to give Black, as a director, the power to honor his promise to the Barclays to prevent transactions like these until the Barclays Transaction was consummated.

**70.** JX 483.

### The Independent Directors Do Not Concede The Legitimacy Of The Bylaw Amendments

The independent directors were not cowed by the Bylaw Amendments. They believed them to be invalid. The CRC therefore continued to meet. On January 25, 2004, the CRC adopted the "Rights Plan." The CRC's adoption of the Rights Plan that day had, of course, been preceded by earlier discussion of such a plan in January. The Rights Plan that the CRC adopted has "flip-in" and "flip-over" provisions that are not unusual and have the effect of making it economically impractical for the Barclays Transaction to proceed unless the Barclays reach an accommodation with the International board.

In adopting the Rights Plan, the CRC was responding to what it, in good faith and on responsible information given the time constraints it faced, reasonably perceived to be serious threats to International. Although the defendants mirthfully point to the CRC members' inability to describe all the plan's features with accuracy, this is hardly surprising and the CRC members understood its fundamental operation.

The most critical threat that the CRC perceived was to the Strategic Process. They believed that the Barclays Transaction was the culmination of an improper course of conduct by Black, in violation of ¶¶ 6 and 7 of the Restructuring Proposal. Rather than having the freedom to consider the variety of options contemplated by that Process and having had Black's principal energies devoted to that Process, International now faced (putting corporate formalities aside) having new controlling stockholders who were buyers—not willing sellers—of International's assets. Moreover, Black had also taken action to give any director veto power, thus denuding the independent board majority of the power that it had at the time of the Restructuring Proposal—power that had been enhanced by that Proposal's requirement that Atkinson and Radler resign as directors.

Consistent with this, the CRC viewed the Strategic Process as having been short-circuited. While open to doing a deal with the Barclays, the CRC did not believe it to be in International's best interests to be forced to hastily conclude a deal simply because Black had not honored his contractual obligations to the Strategic Process. In this sense, the CRC sought to restore International's negotiating authority to the level it had been at when the Restructuring Proposal was consummated.

In addition, the CRC saw the Barclays Transaction as a method whereby Black had taken advantage of the huge loophole in the Tag–Along Provision to deliver control to another purchaser in a non-Permitted Transaction. This rationale emerges less than obviously from the record and appears to have been grounded in legal advice (to which the court and the defendants have not had access). The CRC certainly feels that Black's entitlement to a control premium to the total exclusion of the International public stockholders is less than unquestionable. It appears, however, not that the CRC wished to prevent Inc. from receiving fair value in any transaction, but rather that the CRC wanted to ensure that the other International shareholders should also benefit fairly as well, as Black had earlier assured was also his intention.

Finally, the CRC was aware that Black had reneged on his commitment to repay International and his assurances that Inc. would repay. The CRC viewed the Rights Plan as providing it with leverage to cause Inc. and Black to honor these prior commitments.

A review of the evidence convinces me that the CRC sincerely believed that these were real threats to International and its public stockholders. I am also persuaded that the CRC had no desire to injure Inc.'s public stockholders but believed that their duties to International required them to respond to improper actions undertaken by Inc.'s dominating leader, Black.

*The Barclays And Black Put Debatable Information Into The Public Domain About Their Negotiations And Intentions*

In public filings in the United States and Canada, the Barclays have released information that is of questionable accuracy. In the United States, the Barclays filed a Schedule 13–D stating that they had contacted International's financial advisor and suggested that they would be "willing to consider offering to acquire" International's publicly held shares for $18 per share and that International, through Lazard, had rejected discussions of a transaction at a price at that level.[71] Black—who was given a draft of the 13–D before it was filed—told the Barclays that this disclosure of their "$18 offer" was a "grenade under our opponents."[72] In his deposition, David Barclay's son disavowed the seriousness of the $18 price, calling the conversation in which it was mentioned "exploratory" and the price "by no stretch of the imagination a firm proposal."[73] So did his uncle Frederick.[74]

The public disclosure of these tentative exploratory discussions by the Barclays and their experienced advisors can only be seen as a pressure tactic. The Barclays and their advisors know how to craft firm offers, and know that it is common professional practice for sellers to demand an offer before beginning negotiations. So does Black. Ironically, the Barclays and Black justify Black's failure to disclose his dealings with the Barclays until January 17, 2004 on the grounds that that was the first date notice could be reasonably given because their discussions were not final enough before then. The Barclays' 13–D reveals a very different understanding of materiality.[75]

In Canada, the Barclays also filed offering materials that provide an inaccurate description of the negotiations leading to the Barclays Transaction. In those materials, it is misleadingly stated that the Barclays approached Black about buying his Inc. shares. Omitted from the materials is the actual truth—which is that the Barclays approached Black about buying the Telegraph assets from International and that it was Black who turned the negotiations toward a deal with Inc.

*A Final Comment On The Record*

Having now completed a recitation of the key facts that, although undoubtedly long, necessarily cannot portray all the material evidence fully, it is advisable to comment generally on some factors that influence my interpretation of the evidence.

First, having had a three-day evidentia-

---

71. JX 425 at 7 of 11.

72. JX 469.

73. A. Barclay Dep. at 179–80.

74. F. Barclay Dep. at 35.

75. The defendants point to evidence that Lazard said the Barclays ought to make an offer per share starting with the number "2." This, of course, does not mean the Barclays ever made any bid. As noted, $18 was below the bottom end of the value range Black shared with the Barclays and even that price was never actually offered by the Barclays.

ry hearing,[76] I am in a good position to make certain credibility determinations and have done so. Generally, I found the key International witnesses—Paris, Seitz, and Breeden—entirely credible. I can discern no improper motive they may have had at any time to testify other than truthfully. Although any witness testimony will be afflicted by gaps in memory and other flaws attributable to human imperfection, I am convinced that these witnesses attempted to convey the truth as they understood and remembered it. Furthermore, because their testimony is largely consistent with the deposition testimony from the International independent directors, the credibility of Paris, Seitz and Breeden tends to reinforce the credence I give to the independent directors' testimony.

By contrast, I am instilled with less than full confidence by the witnesses the defendants presented at trial. Peter White, an Inc. and Ravelston director, is so faithful to Black personally that it was difficult for him to be dispassionate. White endeavored to testify truthfully but his testimony that Inc. was financially strapped is undermined by his failure to readily acknowledge that Inc.'s near-term liquidity needs would have been alleviated if Inc.'s board simply had demanded that Black and Ravelston live up to their contractual obligations to Inc.

As to Black himself, it became impossible for me to credit his word, after considering his trial testimony in light of the overwhelming evidence of his less-than-candid conduct towards his fellow directors. In some ways Black was feistily direct, flat-out admitting that he viewed himself as having no obligation to spend time on the Strategic Process after his removal as CEO, despite ¶ 6 of the Re-

structuring Proposal. Black also vigorously defended his failure to inform the International board of his discussions with the Barclays. But then again, he could hardly deny these facts. On more debatable points, I found Black evasive and unreliable. His explanations of key events and of his own motivations do not have the ring of truth. I find it regrettable to say so but it is the inescapable, and highly relevant, conclusion I reach.

The Barclays also bear mention. Despite his daily and vigorous pursuit of the Telegraph assets over many months, David Barclay claimed to be too ill to be deposed. International respected this claim, once it was medically documented, although the record in the case casts doubt on the assertion. Because David Barclay was integral to the negotiation of the Barclays Transaction, his testimony would have been highly probative of several matters International desired to prove. His son Aidan Barclay, who was involved in the negotiations to a much lesser extent, gave helpful testimony but admitted at many points that he did not know what his father had actually done or why. As a result of this record, it is difficult for me to give as much credit to the Barclays' factual arguments as they would like, in view of the fact that their key witness did not make himself available to testify.

Next, a note on privilege is in order. International refused to waive the attorney-client privilege or the business strategy immunity, even by consenting to attorneys'-only treatment. The defendants make too much of this. Although ordinarily independent directors instill more confidence by waiving such privileges in order to allow judicial review of their pro-

---

**76.** The record is very extensive. In addition to six trial witnesses, many deposition excerpts were entered into evidence, as were nearly one thousand exhibits. The parties' briefing alone approached 500 pages in total.

cesses, the situation the International directors face is very challenging and is made more so by Black's conduct. Given the legitimate corporate interests that could be endangered by exposure of the Special Committee's investigation or the CRC's potential options, the strategic decision made by the directors is not at all suspect.

Finally, given the extent of the record and the limited time available for decision, I have obviously not cited to every portion of the record on which I rely. My factual conclusions are drawn from the record as a whole and the citation of particular sources does not mean that other portions of the record do not also support my conclusions. For most points, there is a variety of testimonial and documentary evidence that buttress my findings.[77]

### Legal Analysis

*Overview Of The Legal Issues Presented*

The parties have filed multiple claims for which expedited consideration has been sought.

For its part, International seeks final relief on two counts of its complaint. These counts challenge the validity of the Bylaw Amendments. In one respect, International alleges that the Bylaw Amendments are *per se* unlawful. To wit, International argues that the aspect of the Bylaw Amendments that abolishes the CRC and strips it of the authority invested in it by the board resolution creating that committee is inconsistent with 8 *Del. C.* § 141(c)(2) and invalid. As to the remainder of the Bylaw Amendments, International concedes that they do not violate any statutory prohibition on the top-

ics that may be addressed in a Delaware corporation's bylaws. Instead, International says that the Bylaw Amendments must be declared ineffective because they were adopted in bad faith for an inequitable purpose.

In an unusual move to which I and the defendants somehow acceded, International also moved for preliminary, not final, injunctive relief as to certain claims. First, International seeks a preliminary injunction against the Barclays Transaction, arguing that the transaction was procured by Black through breaches of the Restructuring Proposal, and that Inc. induced those breaches. Second, International seeks identical relief on the ground that the Barclays Transaction resulted from fiduciarily improper conduct by Black that was induced and supported by Inc.

For their part, defendants Black and Inc. filed counterclaims for which they seek expedited final relief. In their counterclaims, Black and Inc. seek an expedited declaration that the Rights Plan adopted by the CRC is invalid. Among other things, Black and Inc. argue that it is statutorily improper for a board of directors to adopt a shareholder rights plan that is triggered by a sale of control of the corporation's controlling stockholder as an entity. Alternatively, Black and Inc. argue that the Rights Plan should be enjoined because it is either an unreasonable response under *Unocal Corp. v. Mesa Petroleum Co.*[78] or an improper disenfranchisement of Inc. under *Blasius Industries, Inc. v. Atlas Corp.*[79] Finally, Black and Inc. also contend that the Rights Plan is invalid because the CRC had been abolished by the time the Rights Plan was purportedly adopted. The Barclays inter-

---

**77.** This is not to say that there is not also evidence from which another reasonable mind might draw different conclusions on some of the factual points.

**78.** 493 A.2d 946 (Del.1985).

**79.** 564 A.2d 651 (Del.Ch.1988).

vened in this action and support the positions taken by Black and Inc., with only insignificant variance.

There are some implications to the parties' choice in the manner of proceeding. First, as to all the claims other than International's claims for breaches of the Restructuring Proposal and fiduciary duty, I am asked to make a final determination of the merits. Therefore, I have made factual determinations as I would have in any post-trial decision. As to the defendants' claims regarding the Rights Plan, that means I can resolve disputed facts and enter a mandatory injunction if appropriate.[80] Second, because International's contract and fiduciary duty claims were pressed on a preliminary basis, the factual findings I make are those that are likely to be found at a later trial. There is much inefficiency in this approach for a reason that should be obvious: The same facts that are relevant to the claims on which the parties seek final relief—i.e., the claims regarding the validity of the Bylaw Amendments and the Rights Plan—are integral to International's contract and fiduciary duty claims. If the parties jointly agree to treat my decision on those claims as final, therefore, I would accept that agreement. Without prior agreement by all parties, I have treated those claims as seeking preliminary relief only. Because I heard three days of testimony and received abundant evidence, however, the preliminary injunction record is a reliable basis from which to make findings, including credibility determinations.

Finally, because of the interrelatedness of the facts among the claims, it makes sense to address the questions of whether Black violated his fiduciary duties and the Restructuring Proposal before deciding the claims addressed to the Bylaw Amendments and the Rights Plan. A determination of Black's conformity with his fiduciary and contractual duties in crafting the Barclays Transaction is critical to the equitable sustainability of the Bylaw Amendments and the Rights Plan.

For that reason, I begin my analysis of the merits of the various claims by examining whether Black was a faithful fiduciary and contract partner. After that, I consider whether International either fraudulently induced, or committed a material breach of, the Restructuring Proposal itself, thus excusing any breach by Black.

I then go on to consider the claims challenging the Bylaw Amendments and the Rights Plan.

Following my discussion of the merits, I discuss International's request for injunctive relief.

### Did Black Breach His Fiduciary Duties In The Process Leading To The Barclays Transaction?

International argues that, even aside from any consideration of the Bylaw Amendments, Black breached his fiduciary duties in several respects during the process leading to the Barclays Transaction. Despite Black's arguments to the contrary, I agree.

The Telegraph was an asset that belonged to International. It constitutes far less than half of International's assets. The International board is empowered by Delaware law to dispose of that asset without seeking stockholder assent.[81] Black's

---

80. Prior case law suggests that this court cannot issue a preliminary injunction requiring redemption of a shareholder rights plan unless the court finds that the injunction is warranted based on undisputed facts. *City Capi-*

*tal Assocs. Ltd. P'ship v. Interco Inc.,* 551 A.2d 787, 795 (Del.Ch.1988).

81. That distinguishes this case from *Thorpe v. CERBCO, Inc.,* 676 A.2d 436 (Del.1996),

asserted power (acting through Inc.) to remove the International board as a means of impeding the sale of the Telegraph does not change the fact that it is the prerogative of the members of the International board—whoever they are—to consider whether a sale of the Telegraph is in the interests of all International stockholders. Not only that, asset sales were one of the options the Strategic Process was specifically designed to consider. The opportunity to sell the Telegraph belonged to International.[82]

Black concealed from the International board the Barclays' intense interest in acquiring that asset. Letters sent to Black by the Barclays seeking to purchase the Telegraph were never given to the International board. Rather, Black took it upon himself to first reject that opportunity and later to divert that opportunity to Inc. The fact that Black mentioned to Lazard that the Barclays were a possible purchaser with an interest in the Telegraph did not fulfill his obligation to be candid to his fellow directors. Rather, as

previously detailed, Black used his knowledge that the Strategic Process would take several months and involve a market canvass to induce the Barclays to deal through him outside of the Strategic Process as a "means" to their "end" of controlling the Telegraph. Black compounded this improper behavior by giving false assurances that he was honoring his obligations to International and not shopping Inc. Adding to his misconduct, Black used confidential information about International to deal for himself and Inc. without disclosing that to the International board.

Thus, Black violated his fiduciary duty of loyalty by, among other acts, (1) purposely denying the International board the right to consider fairly and responsibly a strategic opportunity within the scope of its Strategic Process and diverting that opportunity to himself;[83] (2) misleading his fellow directors about his conduct and failing to disclose his dealings with the Barclays, under circumstances in which full disclosure was obviously expected;[84]

wherein the Supreme Court held that controlling stockholders' diversion of an asset sale would not support certain relief because the asset sale would have triggered a stockholder vote under § 271 that the controlling stockholders could have defeated unilaterally. Notably, the behavior of the controlling stockholders, which was less severe than Black's, was still found to be a breach of the duty of loyalty.

**82.** The defendants argue that a sale of the Telegraph is economically impractical. That is not what Black said, though Finkelstein, in his November 10 letter. While the opportunity may not be the right one after thorough consideration, it was International's to explore, in keeping with the intended operation of the Strategic Process. Black's misconduct, in these peculiar circumstances involving unusual contractual promises, falls within the reach of the corporate opportunity doctrine as explicated by *Broz v. Cellular Info. Sys., Inc.,* 673 A.2d 148, 155 (Del.1996), and other cases.

**83.** Even as controlling stockholders, Black (and Inc., for which Black was both principal and agent to a large extent) had the obligation to inform the International board of the opportunity to sell the Telegraph. *See Thorpe v. CERBCO, Inc.,* 676 A.2d 436, 442 (Del.1996); *In re Digex Inc. S'holders Litig.,* 789 A.2d 1176, 1192–93 & n. 7 (Del.Ch.2000). Even aside from any duties Black owed under the Restructuring Proposal, Black had a duty to inform the International board of the opportunity to sell the Telegraph. *In the absence of the Restructuring Proposal,* if Black also had informed the board that he opposed that option and that he believed it was better for Inc. to market its control position to the Barclays as an alternative, an effort by him to sell Inc. to the Barclays would likely have been within his and Inc.'s rights. But, Black did not behave with this kind of candor.

**84.** *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del.1989) ("[F]iduciaries, corporate or otherwise, may not use superior information or knowledge to mislead

(3) improperly using confidential information belonging to International to advance his own personal interests and not those of International, without authorization from his fellow directors;[85] and (4) urging the Barclays to pressure Lazard with improper inducements to get it to betray its client, International, in order to secure the board's assent to the Barclays Transaction. In sum, Black intentionally subverted the International Strategic Process he had pledged to support through a course of conduct involving misleading and deceptive conduct toward his fellow directors, all designed with the goal of presenting them with a "fait accompli." Most critically, the Restructuring Proposal did exist and constricted Black's, and therefore Inc.'s, range of action. It is difficult to conceive of a meaningful definition of the duty of loyalty that tolerates conduct of this kind.

Although the parties did not spend time briefing the question, Inc. is, regrettably, not an innocent bystander to Black's breaches of fiduciary duty. As International's controlling stockholder, Inc. was well aware of the Restructuring Proposal and Black's obligations to International under it. Inc. was also aware of Black's obligations as Chairman of International. To the extent Inc. is claiming independent rights in the Barclays Transaction, it is compromised by its imputed knowledge of

its agent, Black, who took the leadership role for Inc. in negotiating the Barclays Transaction.[86] Indeed, from the evidence, it is patently clear that Black dominated Inc. in the relevant period and felt free to and did act for Inc.—as in function both its principal and agent—in a manner that was obviously inconsistent with the duties Black owed International.

### Did Black Violate The Restructuring Proposal?

■ International argues that Black violated the Restructuring Proposal. Black argues that he did not in part because that contract supposedly was fraudulently induced or, alternatively, because his breaches are excused by material breaches by International. I consider those arguments in a succeeding section of this opinion. Here, I simply consider preliminarily whether Black's conduct violated the terms of the Restructuring Proposal. The parties agree that this, and the later questions regarding the Restructuring Proposal, are governed by New York law.

I conclude that Black violated the Restructuring Proposal in several respects.

First, Black failed to make payment in accordance with the Proposal's requirements.

others in the performance of their own fiduciary obligations."); *Thorpe,* 676 A.2d at 441–42 (stressing the importance of duty to be candid with fellow directors); *HMG/Courtland Props., Inc. v. Gray,* 749 A.2d 94, 119 (Del.Ch.1999) (directors have an " 'unremitting obligation' to deal candidly with their fellow directors" (citations omitted)); 1 Principles of Corporate Governance: Analysis & Recommendations, cmt. 6 § 5.02(a)(1) at 215 ("A director or senior executive owes a duty to the corporation not only to avoid misleading it by misstatements and omissions, but affirmatively to disclose the material facts known to the director or senior executive.").

85. *Agranoff v. Miller,* 1999 WL 219650, at *19 (Del.Ch. Apr.12, 1999), *aff'd as modified,* 737 A.2d 530 (Del.1999).

86. *See* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 790–91, at 14–18 (perm. ed., rev. vol. 2002) (stating the general rule that "a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation").

Second, Black did not devote his principal time and energy to the Strategic Process as required by the Restructuring Proposal. At trial, when asked about his failure to do so, Black basically said that he had abandoned International to focus on companies at which he had a "proper job."[87] Of course, it was his duty under the Proposal to pursue the Strategic Process energetically, assiduously, and faithfully. The Proposal said that was the very reason he was to remain as Chairman. Black obviously violated his duties in these material respects.

Third, Black violated ¶ 7 of the Restructuring Agreement. In his capacity as a controlling stockholder of Inc. (through Ravelston, which acts as an instrument of Black's will), Black entered into the Barclays Transaction. This Transaction, for reasons that will be further discussed later, has an obvious negative effect on International's ability to consummate a transaction arising out of the Strategic Process. As the record makes clear, the Strategic Process was contemplated to involve a responsible and orderly search for strategic alternatives after an exploration of the market. Among the key alternatives at the forefront of that Process were a sale of assets or a sale of International as a company. As buyers seeking to control International and one of its key assets, the Barclays are likely to—and have already supported actions designed to—severely constrain the intended function of the Strategic Process. By handing control to a bidder before the bidding in the Strategic Process had even begun, Black preempted and thereby negatively affected International's ability to consummate a transaction in the sense that is obviously intended by ¶ 7.

**87.** Trial Tr. at 842.

■ Finally, Black did not give "as much advance notice as reasonably possible" of the Barclays Transaction. For reasons that have already been explained and will be discussed in more detail shortly, Black's fiduciary duties, and his duties under ¶ 6 of the Restructuring Proposal, required disclosure to the International board of his dealings with the Barclays at least as early as mid-November 2003. At the very latest, Black appears to have had an agreement in principle with the Barclays by the first few days of January. His assertion that ¶ 7 did not require him to give notice until all transactional documents were finally signed is not a reasonable construction. Although Black bargained to remove a proposed obligation to give 10 days notice of a proposed transaction and replace it with a reasonableness requirement, this meant that what is reasonable could be longer or shorter depending on the circumstances. In these circumstances, giving notice on January 17 of a "transaction" that had been "proposed" and agreed to in large measure by early January at latest is not "as much advanced notice as reasonably possible."

*Are Black's Violations Of The
Restructuring Proposal
Excused?*

Black claims that any breach of the Restructuring Proposal by him is excused for three reasons. First, he contends that he was fraudulently induced to execute the Restructuring Proposal and that the Proposal is therefore void. Second, he argues that the Barclays Transaction falls within the exception in ¶ 7 permitting a transaction in Inc. shares if it was necessary to prevent a material default or insolvency. Finally, Black argues that International committed several prior material breaches that excuse his breaches.

In the course of the discussion, I will also address in more detail Black's arguments that he has not violated the terms of ¶ 7 because he has given contractually sufficient notice of the Barclays Transaction and because that Transaction does not "negatively affect" International's ability to consummate a transaction resulting from the Strategic Process.

### Black's Fraud In The Inducement Claim Entirely Lacks Merit

Black has argued that he was fraudulently induced into entering the Restructuring Proposal because he claims to have reasonably relied upon assurances that the Special Committee conducted a thorough investigation and determined that the only possible construction of the evidence was that the non-compete payments had not been properly authorized by International's independent directors, when the accuracy of that proposition supposedly remains debatable.[88] That was an odd sentence to write but it is odd because it precisely captures Black's argument.

Black does not contend that he has conclusive evidence that the non-compete payments were in fact properly authorized by International's independent directors. Rather, he is unsure about whether they were and thus harbors a doubt about whether it is his legal or moral obligation to repay the sums he contracted to repay in the Restructuring Proposal.

This argument is flawed in several evident respects.

■■ In order to prove a fraud in the inducement claim under New York law—the law most likely to apply to the Restructuring Proposal—Black must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."[89] Black must prove each of these elements by clear and convincing evidence.[90] Before turning to a detailed analysis of the evidence upon which Black bases his fraudulent inducement claim, I note in general terms why that claim is legally insufficient in three important respects.

■ First, Black cannot establish that he reasonably relied on any representations regarding the thoroughness of the Special Committee's investigation or the certainty or accuracy of its conclusions. Black conducted and relied upon his own investigation into the Special Committee's allegations,[91] and not only had access to,

---

**88.** Black also alleges that he was wrongly coerced into signing the Restructuring Proposal. Black—an assertive and experienced businessman advised by his managerial subordinates, and his distinguished attorneys David Boies and Jesse Finkelstein—did not lack the free will to sign a contract. His arguments to the contrary are frivolous.

**89.** *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 153 (2d Cir.1995) (applying New York law); *see also Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir.1994). The parties agree that New York law governs Black's fraudulent inducement claim. The other possible governing law is that of Delaware, which is substantively similar to New York's on these

points. *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983) (listing elements of fraud claim under Delaware law).

**90.** *See, e.g., Sado v. Ellis*, 882 F.Supp. 1401, 1405 (S.D.N.Y.1995) (citations omitted); *Banque Arabe et Internationale D'Investissement*, 57 F.3d at 153 (citations omitted); *Primedia Enthusiast Publ'n Inc. v. Ashton Int'l Media, Inc.*, 2003 WL 22220375, at *3 (S.D.N.Y. Sept.25, 2003) (citations omitted).

**91.** *See, e.g., Jacobs v. Lewis*, 261 A.D.2d 127, 128, 689 N.Y.S.2d 468 (1999) ("[A]s plaintiffs admitted to personally conducting an investigation of [defendant's work] they can make no sustainable claim that the relied to their

but actually possessed virtually all of, the evidence that he now cites as supporting his uncertainty about whether the non-compete payments were or were not properly authorized by the independent directors.[92] After all, he was a key recipient of the non-compete payments and his protestations of ignorance about the circumstances that led to those payments strain credulity, given his controlling and hands-on managerial style and the absence of any plausible explanation for his ignorance. Moreover, even if Black was materially limited in his ability to obtain relevant documents—which he was not—his duty, as a sophisticated and skilled businessperson, was to "protect [him]self from misrepresentation."[93] For example, Black could have demanded a specific contractual representation that would have released him from his obligations under the Restructuring Proposal if information were later discovered suggesting that the non-compete payments were properly authorized.[94] Or, he could have refused to sign that agreement until he himself saw all the documents that the Special Committee relied upon in coming to its conclusions or all the documents he desired to see. By his own admission, Black at best relied on statements of opinion that the Special Committee had conducted a thorough investigation and that no other construction could be put upon the evidence it discovered. His supposed reliance on the opinions of others, without protecting himself from the possibility that those opinions were inaccurate, is unreasonable.[95]

detriment upon [defendant's] representations as to her own expertise ...."); *Mayer v. Union Indus., Inc.,* 4 A.D.2d 787, 788, 165 N.Y.S.2d 135 (1957) (holding that plaintiff did not establish justifiable reliance because "[h]e was careful to make a personal inspection ... before the sale"); *Miller v. Greyvan Lines, Inc.,* 284 A.D. 133, 138, 130 N.Y.S.2d 378 (1954) ("[T]he record contains no proof of reliance by the plaintiff upon any alleged misrepresentations ...; in fact, the record indicates the direct antithesis—that the plaintiff placed no reliance upon [the defendant's representations], but sought elsewhere for his information."); *Salvatore Re v. Diamond,* 249 A.D. 781, 781, 292 N.Y.S. 54 (1936) ("[P]laintiff did not rely upon misrepresentations of defendants as to a material fact, and was not misled by their concealment of such material fact, but he relied upon an investigation made by his own lawyer.").

92. Under New York law, Black cannot disclaim a contract on grounds of fraudulent inducement where the fact allegedly withheld from him is one that he already knows or could reasonably discover. *See Sado,* 882 F.Supp. at 1407 ("[A] party cannot claim reliance on a misrepresentation where he could have discovered the truth with ordinary diligence.") (citation omitted); *Sudul v. Computer Outsourcing Servs.,* 868 F.Supp. 59, 61 (S.D.N.Y.1994) ("Possessed of all of the relevant facts, [plaintiff] could and should have decided for himself whether defendants' representations were accurate."); *West v. Szwalla,* 234 A.D.2d 638, 639, 650 N.Y.S.2d 465 (1996) (defendant "cannot claim reliance on plaintiffs' representation as he was aware of [the underlying facts] and should have decided for himself if the representation was accurate").

93. *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1543 (2d Cir.1997). *Accord Belin v. Weissler,* 1998 WL 391114, at *6 (S.D.N.Y. July 14, 1998) ("even absent easy access to the information," a sophisticated party is "under a further duty to protect itself by, for example, insisting that the information be provided to it as a condition to closing the deal").

94. *See Primedia,* 2003 WL 22220375, at *6 ("[C]ourts may disregard a fraudulent inducement claim and give effect to a contract when the parties have negotiated at arms lengths and they are sufficiently sophisticated that they could have easily protected themselves either through obtaining readily available information or alternatively including a protective clause in the agreement.").

95. As one New York court stated:

[W]here, as here, a party has been put on notice of the existence of material facts

Second, "[s]cienter, or knowledge that a representation is false, is an essential element of a fraud claim,"[96] and nothing in the record suggests that the International directors intended to mislead Black in any way. There is no indication that those directors did not hold a good faith belief that they had conducted a careful review of the evidence or that they were not truly convinced that the payments were unauthorized.

Finally, Black simply has failed to establish that any representation he supposedly relied upon was false in any way. None of the evidence he claims to have recently discovered supports his argument that the payments may have been properly authorized, or impugns the diligence of the Special Committee investigation that led to the opposite conclusion.

For example, Black points to several public filings by International disclosing the payments. Because these disclosures said the independent directors had approved the non-compete payments and because the independent directors signed the disclosures after being provided with draft copies, Black says that there is a doubt that the necessary approvals were not procured. It is difficult to respond to this argument with equanimity given that each of these filings was signed by Black him-

self, the filings were referred to by Mr. Finkelstein in his November 10 letter written to the Special Committee on Black's behalf, the filings were publicly available at the time Black signed the Restructuring Proposal, Black had to have known that there was a process for the International audit committee to review such filings before their submission to the SEC, and the Restructuring Proposal specifically contemplated correction of these very filings on this very subject. Nothing in these filings supports a claim of fraud in the inducement.

Likewise, Black refers to certain documents that he claims have come to his attention since the Restructuring Proposal was signed. Among these are notes of a KPMG staffer in connection with certain audit committee meetings at International and Inc. Again, this evidence was referred to in large measure in Mr. Finkelstein's November 10 letter. And the fact that the Special Committee had not yet received KPMG's work papers as of November 15, 2003 hardly suggests that the Committee did not conduct a diligent review of all relevant evidence. Black's investigation also was supported by all the key executives who were involved in the non-competes, including Radler, Atkinson, Boultbee and Kipnis. Black was hardly without

which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.
*Rodas v. Manitaras*, 159 A.D.2d 341, 343, 552 N.Y.S.2d 618 (1990), *quoted in Lazard Freres*, 108 F.3d at 1543. Black's suggestion that it was reasonable for him to rely on the International directors without conducting his own

investigation because the supposedly misrepresented matters were within the "peculiar knowledge" of International directors is unconvincing. Black has not shown that he had "no independent means of ascertaining the truth," *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980), and "all of the information that [defendant] now claim[s] was concealed from [him] was either a matter of public record, was not pursued by [him], or was disclosed, at least in part, by" International, *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 123 (2d Cir.1984).

96. *Sado*, 882 F.Supp. at 1406.

access to the facts. And, had Black wished to dig deeper into this evidence, he had a simple option on November 15. He could have refused to sign the Restructuring Proposal until he gathered even more evidence.[97]

■ Perhaps the most interesting evidence that Black relies upon as justifying his fraudulent inducement claim are three written consents of the International Executive Committee signed in September 2000. The first, dated September 15, 2000, resolves to approve the sale of certain U.S. community newspapers—this is the so-called CNHI II transaction. In the resolution, the Committee indicates that the asset sale was approved and that in connection with it there would be a "mutually acceptable noncompete agreement" between International, Inc., and the buyer in exchange for an unspecified monetary payment. It was further resolved that International's officers would have "sole discretion" to negotiate the terms of the non-compete agreement.[98] By its plain terms, this written consent nowhere refers to any non-compete agreements with individual executives of International. Most important, the written consent was signed by Black, Radler, and Richard Perle,[99] the three members of the Executive Committee. Therefore, two of the three authorizing signatures were by Black and Radler, the two principal beneficiaries of the non-competes.

The second written consent is dated September 18, 2000 and is also signed by Black, Radler and Perle. It purports to authorize a sale of assets to Paxton Media

Group, Inc. and the entry of non-competes with Paxton involving International and "certain executive officers."[100] It does not mention non-compete payments to Inc. or specify the certain officers. It also does not set forth the terms of the non-competes or indicate that the certain executive officers would receive money. Again, the "mutually acceptable noncompete agreement" was to be negotiated by International's officers.

Lastly, on September 19, 2000, the Executive Committee executed a consent approving a sale of assets to Forum Communications, Inc. Like the Paxton asset sale written consent, the Forum consent refers to non-competes between the purchaser, International and certain International executive officers.[101] No mention of a non-compete with Inc. is included. Nor is there any specification of the dollar amounts of the non-compete or that the certain (unspecified) officers would receive payments. Again, it was up to International officers to negotiate a "mutually acceptable noncompete agreement."

Black claims that these consents were concealed from him when he entered the Restructuring Proposal and that they contain evidence probative of proper approval by the International independent directors. This argument is flawed as support for a fraudulent inducement claim for several reasons.

Initially, these are again documents that Black himself signed. If he and his managerial minions (including Radler, Atkinson, Boultbee and Kipnis) cannot recall documents that they participated in drafting

---

97. For example, Black says the Special Committee had the relevant International minutes. He could have demanded a copy of those files before signing.

98. JX 616.

99. For reasons in part identified by director Burt, Perle is not considered an independent director.

100. JX 617.

101. JX 618.

and signing, that is regrettable but it is a poor excuse to accuse others of fraud.

More substantively, by their own terms, the written consents hardly evidence anything even approaching what would constitute proper approval by independent directors of the non-compete payments. After all, the two principal beneficiaries of the non-competes were two of the three signatories of each. And, as noted, the Paxton and Forum consents do not reference non-competes with Inc. The CNHI II consent does not mention non-competes for company officers. None of the consents detail the terms of the non-competes. Most notably absent is any indication of the sums that would be paid. Furthermore, the consents do not indicate which officers were to sign non-competes or that they were to personally receive payments. And, of course, the consents by their own terms do not even tangentially address the non-competes that Black and the others signed with one of International's own subsidiaries. Finally, the consents leave it to later negotiations by International officers—all of whom reported to Black and Radler—to negotiate the actual terms of the non-competes.

I like to think I am a close reader. But I do not discern in these consents evidence of proper approval by independent directors of a conflict transaction. Rather, they contain references to possible conflict transactions buried in a pile of legalese. They hardly put one on clear notice of what is contemplated, and surely do not purport to approve the specific terms of any non-competes to conflicted parties, such as Inc. and Black.

 At trial, however, Black and Inc. pointed to another piece of evidence that they contend operates in concert with these consents to buttress his claim. That evidence is International board meeting minutes from December 4, 2000.[102] In those minutes, the International board ratified the consents discussed above pursuant to an omnibus resolution addressing five actions taken by the Executive Committee. The board minutes nowhere indicate that the International board was shown the consents or informed about the non-compete aspects of those resolutions. By the face of the minutes, the International board appears to have been told they were ratifying asset sales.[103] There is no indication that there was any discussion of non-competes by the board or that the word even came up at the board. As the evidence reveals, this board meeting also preceded the backdated February 2001 payments to Black and his colleagues, and the April 2001 non-compete payments. There is also no consent that even arguably relates to the non-compete payments Black and his confreres received for agreeing not to compete with one of International's own wholly owned subsidiaries.

If anything, the December 2000 board minutes are suggestive of what, in the old days, might have been called constructive fraud. The inference from the record one inescapably inclines towards is that the consents were drafted to give the least possible notice of their non-compete references, were not actually placed before the board, and were ratified by a board that never saw them and was not informed that they contained within them authorization for officers to negotiate future conflict transactions in favor of other unspecified officers. That is, by their own terms, the consents do not even approve specific non-competition contracts.

If there was ever a time when this sort of approval process would be deemed

---

102. JX 620.

103. *Id.*

"proper," that time is long distant. At worst, the International board was purposely duped and there was fraud on the board.[104] At best, they were entirely uninformed. In either instance, the International independent directors did not properly approve the non-compete payments under Delaware law.[105]

As important, Black's fraudulent inducement claim would fail even if he now had evidence conclusively showing that the non-compete payments were properly authorized. Black knew when he signed the Restructuring Proposal that the Special Committee process was not yet fully complete, and yet he chose to sign that agreement precisely because he considered its terms less onerous than the potential consequences of refusing to negotiate a compromise with the Special Committee until he himself saw irrefutable evidence that the payments were unauthorized. That compromise allowed him to save face and avoid more severe action by the International board, and—as Black himself stated—"head off a real investigation"[106] such as an official inquiry by the SEC. Black may feel that "newly discovered" evidence suggests that he should have taken his chances in the hopes that probative evidence of proper authorization would eventually be uncovered, but that does not excuse him from the terms of the settlement he agreed to in November.

As a concluding matter, it also bears noting in connection with Black's fraudulent inducement claim that he filed a false disclosure statement to the International audit committee in its process of preparing the company's year 2000 10–K. In the document in which he was supposed to identify payments such as the non-competes, Black failed to identify millions of dollars in non-compete payments. Additionally, Black has admitted that International's public filings regarding the non-competes were inaccurate because they wrongly describe when the payments were made and why they were made. *The filings also completely omit any mention of over $16 million in non-compete payments made to Inc.*

In sum, there can be no clearer example of an inadequate fraudulent inducement claim than this one. The best evidence in the record suggests that the statement in the Restructuring Proposal that there was not proper authorization for the non-compete payments is accurate. Moreover, Black had personal knowledge of and access to the evidence that he claims was concealed from him and cannot base a claim for fraudulent inducement on his unthinking and trusting reliance upon the independent directors—especially when his claim of reliance is contradicted by the evidence. Within days of signing the Restructuring Proposal, Black was suggesting to the Inc. board that proper approval existed.

Black signed the Restructuring Proposal in large measure to avoid being accused of purposely engineering improper payments. He trusted in no one but signed an agreement to repay the non-compete payments knowingly and willingly in order to avoid more serious consequences involving those payments. The independent directors and

---

**104.** *See Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del.1988) (stating that "misleading and deceptive" behavior towards directors is a "fraud upon the board."); *HMG/Courtland Props., Inc. v. Gray,* 749 A.2d 94, 119 (Del.Ch.1999) (same).

**105.** I have closely scrutinized all of the other evidence Black cites in support of his claim that the non-compete payments were properly approved. None of that evidence supports a rational inference to that end.

**106.** JX 159.

their advisors simply stated their opinion to Black. That opinion has not been shown to be false. Nor did the independent directors deny Black access to any information.

### The Exceptions To Paragraph Seven Do Not Avail Black

Black has attempted to justify his support for the Barclays Transaction on the basis that Inc. faced a "material default" or "insolvency" within the meaning of ¶ 7 of the Restructuring Proposal and that the Barclays Transaction was "necessary" to avoid one of those fates. Black bears the burden to establish that this contractual exception applies.[107]

The record evidence is entirely to the contrary. Within the time frame necessary for International to complete the Strategic Process, Inc.'s major financial issue was the requirement to make a $7.4 million interest payment in March 2004. This was not an unexpected issue and Black knew about it when he signed the Restructuring Proposal. This was part and parcel of the relatively minor liquidity issues to which he often referred.[108] For the entire year of 2004, Inc.'s CFO projected on January 13, 2004 that it would be $16 million in the red, assuming it did not pay dividends on its preferred shares.[109]

Given Inc.'s assets, this predicament does not come close to amounting to a threat of a "material default" or "insolven-cy." Although it is true that the bulk of Inc.'s assets—much of its International stock—is encumbered to cover its debt instruments, Inc.'s other assets include:

- Approximately 1.25 million unencumbered shares of International Class A Common Stock with a market value of over $17 million;
- Loans immediately owed and payable from Black and Radler worth $5.9 million and secured by securities worth over $7 million; [110]
- A support agreement from an affiliate of Ravelston—a company that Black describes as rich and debt-free and which has assets of over $500 million—requiring Ravelston to provide Inc. with support of at least $14 million a year, which is to be paid quarterly and may even be paid at irregular intervals if necessary to provide "greater certainty" [111];
- Real estate assets worth approximately $15 million.

According to Inc.'s now co-COO, and close Black confidant, Peter White, Inc. has an asset to liability coverage ratio of 3 to 1. In the Barclays Transaction, the Barclays procured representations that Inc. was not insolvent. That representation is clearly accurate. Inc. is nowhere near insolvent.[112]

 Nor was the Barclay Transaction "necessary" to avoid a "material default."

---

107. *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 53 (Del.Ch.2001) (citing New York on this point).

108. Later in 2004, Inc. will be confronted with the redeemability of $92.7 million of Series III preference shares. But the failure to redeem on the due date will not pose a threat of insolvency and could have been addressed by a successful outcome to the International Strategic Process.

109. JX 839.

110. JX 580 (Hollinger Inc. Form 6–K for month of December 2003).

111. JX 584 (RMI/HI Support Agreement, dated Mar. 10, 2003).

112. Indeed, White stated that in a meeting of Inc.'s board of directors on November 21, 2003, Black stated that Inc. was "financially sound." White Dep. at 61.

To cover the upcoming interest payment, Inc. simply had to call in the Black and Radler loans and draw on its support agreement from Ravelston. It took no steps to do so. Likewise, it could have sought financing using its real estate assets or its unencumbered Class A shares— shares that were irrelevant to its voting control. It took no steps to do so. Inc. could have sought short-term help from International to enable the completion of the Strategic Process. It took no steps to seek that help.

The word "necessary" in the Restructuring Proposal means that Black may invoke the "material default or insolvency" exception only if he enters into a transaction necessary to avoid one of those events. That is, it implies that Inc. is free to enter into transactions proportionate to the "material default" or "insolvency" risk it faced. That interpretation of the Restructuring Proposal is also supported by the extrinsic evidence, which indicates that Black emphasized the modest liquidity issues Inc. faced and Inc.'s need for flexibility to engage in financing transactions proportionate to those issues.

Inc. faced no insolvency risk and it could have avoided a material default by asking Black, Radler, and Ravelston to live up to their contractual obligations. Inc.'s co-COO, Peter White, admitted this at trial. But, his testimony also revealed that Inc. took no responsible steps to hold Black, Radler and Ravelston accountable. Ravelston is a rich, debt-free company. Black owes it over $10 million. Ravelston has the resources to live up to its support obligations to Inc. if Black causes it to. Black can pay Inc. his debt if he chooses to and Inc. can seize his collateral if he does not.

Furthermore, Inc. could have sought to develop a financial strategy that would enable it to weather the minor drizzle it faced until the Strategic Process was completed. It failed to do so.[113]

Moreover, given that 1) Ravelston has approximately $500 million in assets; 2) Black himself has stated that Ravelston is a rich, debt-free company; 3) Black owes Ravelston approximately $10 million; and 4) Black never engaged in good-faith negotiations with International regarding Ravelston's management fees for January through June 2004, Black's argument that Ravelston cannot live up to its obligations to Inc. under the support agreement because Ravelston has not received payments from International smacks of bad faith. For Black to attribute the Barclays Transaction to his fiduciary responsibilities to Inc. and to International's actions when he owes Inc. money and has refused to cause Ravelston to honor its support obligations strains credulity and is an argument advanced with little grace.

In view of the undisputed facts, it is clear that Black cannot justify the Barclays Transaction as "necessary" to avoid a "material default" by or "insolvency" of Inc. Therefore, unless Black's breach is otherwise excused, his entry into the Barclays Transaction is a violation of the Restructuring Proposal.

### Black Also Breached His Obligation To Give Prompt Notice Of The Barclays Transaction

The exception to ¶ 7 also does not apply because Black did not given reasonable notice. From before the time Black signed the Restructuring Proposal, he was aware that the Barclays were interested in

---

113. The record indicates that Inc. had proportionate financing options open to it but that Black focused on deals of the kind likely to violate ¶ 7. Indeed the Barclays even offered short-term help.

buying the Telegraph, an asset of International's. Black engaged in serious negotiations with the Barclays from mid-November 2003 until signing a deal with them. He had ample opportunity to give International the required notice of a "proposed transaction." Black instead consciously chose to conceal that "proposed transaction" until the latest possible time.

Even worse, in so doing, Black breached both the Restructuring Proposal and his fiduciary duties. The opportunity to sell The Daily Telegraph belonged to International and fell well within the scope of the Strategic Process. That was the same Strategic Process to which Black was bound to devote his principal time and attention.

Instead of ensuring that International could avail itself of an opportunity to deal with a reputable buyer, Black usurped that opportunity for himself. Despite the Barclays' clear willingness to deal with International directly, Black diverted them from that path and led them to believe that they could only obtain control of the Telegraph through him. The fact that the Barclays contacted Lazard separately does not detract from the seriousness of Black's misconduct, because neither Black nor the Barclays indicated that International was in unwitting competition with the very same person—Black—who was supposed to be finding deals with buyers like the Barclays for it.

Quite plainly, the Restructuring Proposal required Black to give International much earlier notice of a "proposed transaction" with the Barclays. By the latest, Black had formulated a specific "proposed transaction" with the Barclays in the first week of January 2004.[114] As important, his fiduciary duties required him to bring the opportunity to sell the Telegraph to the International board's attention and to inform them earlier if he wished to compete with International in the process of dealing with the Barclays by diverting their interest—as he clearly did—towards a purchase of Inc. When confronted by fellow directors on several occasions and presented with questions that demanded his honest revelation of his negotiations with the Barclays, Black purposely concealed those dealings.[115]

In so doing, he breached the Restructuring Proposal and his fiduciary duties.

### The Barclays Transaction Has An Obvious Negative Effect On The Strategic Process

 Black and Inc.—joined by the Barclays—have argued strenuously that the Barclays Transaction does not "negatively affect [International's] ability to consummate a transaction resulting from the Strategic Process."

According to the defendants, so long as International has the same technical legal capability to close a deal as it had before the Barclays Transaction, there is no nega-

---

**114.** For example, Frederick Barclay referred to late December as being near the end of the negotiation process and Black wanted to sign a deal in the first week of January.

**115.** Black argues that he did not have a "proposed transaction" until January 17, 2004, the day he gave notice. I conclude otherwise. I read the Restructuring Proposal as requiring prompt notice of a "proposed transaction" necessary to avoid a material default or insolvency as soon as such notice can be

reasonably given. On November 20, Black "proposed" a sale of Inc. to the Barclays. At the very latest, moreover, Black could have given notice of a proposed sale of Inc. several weeks earlier than he did. The Barclays deal was well crystallized by then. As noted, of course, Black's failure to give earlier notice of the Barclays' interest not only violated his commitment to the Strategic Process under ¶ 7 of the Restructuring Proposal, it also violated his fiduciary duties.

tive effect on International's ability to consummate a transaction resulting from the Strategic Process for purposes of ¶ 7. Because a sale of Inc. has no affect on International's capital structure, International possesses the same "ability" to close a deal as it always had.

The problem with this argument is that it proves *way* too much.

If one accepts this argument, *no* sale of Inc. shares could conceivably have the required "negative[ ] [e]ffect" and thereby violate ¶ 7, rendering the entire paragraph meaningless, because no change in a parent corporation's ownership structure ever actually impedes its subsidiary's legal ability to consummate any transaction.

A short hypothetical will demonstrate that this could not have been the intended meaning of the phrase "negatively affect [International's] ability to consummate a transaction." Imagine how the rest of a conversation starting like this would have gone:

> Black: I just want to make it clear that I am free to sell Inc. to a bidder before the bidding in the Strategic Process has even begun. That should not negatively affect International's ability to consummate a transaction because the International board, as a legal matter and whatever its membership, will still have the power, subject to stockholder approval when necessary, to pursue any transaction. Even though I know that a buyer of Inc. is incredibly unlikely to want to turn around and sell International or an asset like the Telegraph, that buyer's disinclination does not limit any legal capacity International possesses, so a sale of Inc. is exempted from the reach of ¶ 7. It just won't have the very precise and limited negative effect contemplated by that section.

Had Black argued to the International board in November that "negatively af-

fect" has the meaning he now ascribes to it in this litigation, my sense is that the Independent directors would have insisted on even clearer language making even more certain that ¶ 7 had real meaning. But, Black made no such statement to the International board, suggesting that his intent in agreeing to ¶ 7 was to adopt a meaning of "negatively affect" that most comports with those words' plain meaning, one that encompassed transactions at the Inc. level that, while not necessarily impeding International's technical legal ability to consummate a transaction, made it less likely that rational businessmen would deem it worthwhile to continue to participate in that Process, thus "negatively affect[ing] [International's] ability to consummate a transaction resulting from the Strategic Process."

Both the terms of the Proposal and the negotiating history suggest that ¶ 7 embodied a more common sense and less technical understanding of "negative[ ] [e]ffect." As Paris, Breeden, and Lazard's Zachary credibly testified, it was critical to the Strategic Process that the market did not perceive that Process to be in competition with simultaneous negotiations going on at the Inc. level. Black's own public statements and contractual commitments to support the Strategic Process contradict his assertion that the International board always understood that Black considered himself free to pursue a parallel process involving Inc. The evident purpose of ¶ 7 was to have major transactions at the Inc. level that could compromise the Strategic Process in a practical sense—such as a sale of Inc.—blocked, except in certain narrow circumstances. It is hard to imagine a more obvious negative effect on a Strategic Process involving a possible sale of major assets or the entire company than the consummation of a transaction instituting a new indirect controlling stockholder

with no desire to sell precisely because it had just purchased.[116]

Notwithstanding the plain meaning of ¶ 7, the defendants insist that the Barclays Transaction does not violate that provision because the Barclays supposedly are open to any transaction and they are no more bound to vote in favor of—or otherwise refrain from derailing—a transaction resulting from the Strategic Process than Black would be if he remained International's ultimate controlling stockholder. That argument is nonsense and suggests that Black undertook no serious obligations in ¶¶ 6 and 7 of the Restructuring Proposal at all. That is simply not the case. By severely limiting his scope of action as the ultimate controlling stockholder, Black gave real potency to the Strategic Process. While he remained free to cause Inc. to reject a transaction that came out of that Process, he could not subvert the Process through a pre-emptive sale of Inc. except under conditions that did not exist here. So bound, Black (and his controlled entity, Inc.) had every incentive to vote for a value-maximizing deal at the International level, so long as Inc. was treated fairly. Black had made representations to this direct effect.

As a practical market reality, there can be no question that the Barclays Transaction "negatively affects" the Strategic Process. Lazard's Zachary credibly testified to the common sense proposition that a change of control at Inc. "would ultimately lead people who were involved in a process to think that the transaction had already occurred, there was nothing for them to do, and that there would not necessarily be any assets [for] them [or] the entire company available for purchase by them." [117]

When the Restructuring Proposal was signed and publicly explained, the market understood that the incumbent International board could have sold material assets—such as The Daily Telegraph—without a stockholder vote or unanimous board approval. Before the Barclays Transaction and the Bylaw Amendments, potential buyers believed that International was engaged in a Strategic Process with Black's full support and participation. That Process, the public was informed and Black contractually pledged, was one that would involve all options, including a sale of International as a whole or a sale of any or all of its assets.

By their own conduct, the Barclays have made absolutely clear that they desire the Telegraph, believing its acquisition to be "once in a lifetime opportunity." Having bought Inc. so as to obtain voting control over that asset—as an admitted "means to an end" [118]—it is implausible to think that they are open-minded about having International turn around and sell it. By their own actions in formulating the Bylaw Amendments, Black and the Barclays acted to try to give themselves veto authority over any asset sale that would be favored by a majority of the International board.

Therefore, it is ludicrous to think that International is as free to sell itself to a buyer now as it was before the Barclays Transaction. When the Restructuring

---

116. My conclusion that the Barclays Transaction plainly has the sort of proscribed negative effect on International's ability to consummate a transaction resulting from the Strategic Process is supported by the record as well as common sense and is not undermined by the fact that the plaintiffs chose to invoke the business strategy privilege and did not disclose the names of actual bidders participating in the Strategic Process who allegedly dropped out of the Process once the Barclays Transaction was announced.

117. Trial Tr. at 490.

118. F. Barclay Dep. at 30.

Proposal was entered, Black had committed to selling International on the open market. Instead, by his breaching conduct and the Bylaw Amendments, Black has sought to limit International's options to those that are available from the Barclays. Until they assume voting control, he has also bound himself to use his "reasonable best efforts" to ensure that International does not "issue, grant, sell, transfer, pledge, lease, dispose of, encumber, acquire or redeem (i) any [shares of Inc.] or other securities of [Inc.] or its Subsidiaries; or (ii) any material property or assets of [Inc.] or any of its Subsidiaries." [119] That is, Black has contractually obligated himself to prevent many of the very transactions the Strategic Process was set up to explore.

### International Did Not Breach The Restructuring Proposal In Any Material Respect

Black claims that his breaches of the Restructuring Proposal are excused because of earlier, material breaches by International. None of his claims of breach have force.

First, Black claims breach because no policy regarding the International corporate aircraft was ever negotiated between Paris and himself. As Paris credibly testified, International's audit committee decided to ground the company's corporate jet shortly after the Restructuring Proposal was signed. Paris promptly discussed this with Black. Black conceded that the airplane was not material to him, that it was not worth the publicity to fight about, took

no further steps to discuss a policy with Paris, and thereby acquiesced in the new policy, which is that there would no longer be a corporate aircraft. Black did not dispute this at trial.

Second, Black alleges that International did not honor its promise to negotiate an interim management agreement with Ravelston. That claim lacks factual foundation. Paris transmitted a proposal to Ravelston that Ravelston never countered. Black argues that the proposal was ridiculously low. But it was a first proposal and Black ignores the fact that the Restructuring Proposal involved the elimination of a number of officers who were formerly serving International via Ravelston's payroll. Ravelston's own costs to provide services to International were greatly reduced. Most important, Black and Ravelston defaulted in the negotiation process, not International. If Ravelston wished to negotiate, it could have.[120]

Third, Black claims to have been excluded from the Strategic Process. This is also baseless. The evidence reveals that Black was included in the Lazard process and received whatever information Lazard prepared during its process.[121] There is no basis to infer that Lazard favored Paris over Black. There is no doubt that Black would have had more contact with Lazard had he chosen to fulfill his duties under the Restructuring Proposal. By way of example, had Black channeled the Barclays' interest into the Strategic Process in a proper and forthright manner, he, Paris, Lazard and the International directors

119. JX 425 at 20 of 53.

120. Black has also disputed the non-payments of certain fees allegedly owed under Ravelston's 2003 management contract. Fees due under that contract are not dealt with in the Restructuring Proposal and that contract's alleged breach would not constitute a breach of the Restructuring Proposal. There is also no

evidence that Black sought to negotiate this dispute urgently.

121. For example, Paris testified that he was not "aware of any draft documents that [he] received that Mr. Black did not receive." Trial Tr. at 81–82.

could have decided whether it made sense to pursue immediate negotiations with the Barclays. Instead, Black knew that International was proceeding deliberately to prepare offering materials to go to a wide universe of potential buyers and that this would take time. Any lack of fervent activity was Black's own fault, as International and its advisors had no reason to believe that urgent action was needed.

Finally, Black alleges that his termination as Chairman on January 17 excused his breaches. The problem with this is that by January 17, it was clear that Black was not pursuing the Strategic Process as he had promised to do. That was the very purpose for which Black was to remain as Chairman. Through his negotiations on the so-called standstill, Black had made abundantly clear that he was now dealing primarily for himself and other entities, and not International. By that time, Black had also failed to pay his first installment on the non-compete payments and had made it known that he was contemplating reneging altogether on the Restructuring Proposal. Of course, by that time, the International board also reasonably suspected that Black was intent on consummating a transaction in violation of ¶ 7 of the Proposal. Because of Black's own contractual breaches, his removal does not violate ¶ 6.

■ Moreover, by the time of his removal, Black had taken a step that, I conclude, is an additional legal justification further excusing compliance with the provision of the Restructuring Proposal indicating that Black would remain as Chairman. In late December, Black refused to provide evidence to the SEC in connection with its investigation of certain events at International. Black cited the U.S. Constitution's privilege against self-incrimination. As an experienced businessman, Black had to know that his decision to refuse to provide evidence to federal investigators made it impossible for the International board to retain him as its Chairman. It is obviously implicit in the Restructuring Proposal that Black could be removed as Chairman if his later conduct (such as his prior breaches of fiduciary duty and of the Restructuring Proposal itself) created an independent need for his removal by the board.[122] In the case of the chairman of a public company, conduct rising to the level that contractually justifies a removal irrespective of the Proposal's terms obviously includes a chairman's refusal to cooperate with a federal investigation of the company's internal affairs.

Buttressing this conclusion that Black's contractual right to serve was implicitly premised on his agreement to behave as is expected of a public company's chairman is the bargaining history of the Restructuring Proposal itself. A central purpose of the Restructuring Proposal had been the intention to instill confidence in the investing public and federal authorities that the company was rectifying its own problems. Indeed, in the November 17 press release announcing the Restructuring Proposal—a release Black specifically approved and helped craft—International indicated that it had provided the SEC with "the findings of the Special Committee, and [International] will cooperate fully with any inquiries stemming from these matters."[123] A company cannot "cooperate fully" when its

---

122. Cf. Rohe v. Reliance Training Network, Inc., 2000 WL 1038190, at *16 n. 50 (Del.Ch. July 21, 2000) (stating that an agreement to vote for a director could be excused if the director later engaged in material misconduct justifying removal).

123. JX 184. Black had stressed International's commitment to cooperate with the SEC in explaining the Restructuring Proposal to the Inc. board on November 16, 2003. See JX 178.

chairman refuses to answer the SEC's questions. Although Black may have possessed the personal right to invoke the privilege, that does not immunize him from all collateral consequences that come from that act. Given his choice not to cooperate with the SEC, he left International's other directors with no practical option other than to remove him as Chairman. The decision to do so did not breach the Restructuring Proposal.

### Were The Bylaw Amendments Properly Adopted?

I turn now to International's challenge to the Bylaw Amendments. As discussed in part previously, the Bylaw Amendments prevent the International board from acting on any matter of significance except by unanimous vote; set the board's quorum requirement at 80%; require that seven-days' notice be given for special meetings; and provide that the stockholders, and not the directors, shall fill board vacancies.

International argues quite plausibly that the Bylaw Amendments were designed to ensure that Black, and thereafter the Barclays, can veto any action at the International board level that they oppose. Black admitted that the Bylaw Amendments were designed to protect against the adoption of the Rights Plan and would give him (and other non-independent directors allied to him) the ability to prevent the International independent directors—who constitute the board's majority—from pursuing strategic options he opposes. Quite obviously, the Bylaw Amendments also deliver on Black's contractual obligation to the Barclays to take measures to thwart International from engaging in any significant transactions, including asset sales or the signing of a merger agreement.

International argues that the Bylaw Amendments constitute an attempt by Black to cement the injury he caused to International's Strategic Process through his prior violations of his fiduciary and contractual duties. In essence, the Bylaw Amendments permit Black to proceed with the Barclay Transaction even though that Transaction was the product of improper and inequitable conduct. Because of the inequitable motivations behind the Bylaw Amendments, International argues that they must be declared ineffective. As to one particular aspect of the Bylaw Amendments—the abolition of the CRC and the termination of its authority—International also argues that the Bylaw Amendments are not simply inequitable, but violative of the DGCL as well.

By contrast to International, the defendants contend that the Bylaw Amendments simply are a proper attempt by Inc. as a majority stockholder to prevent itself from being wrongly excluded from exercising the power that legitimately flows from voting control. It is the International independent directors, they argue, and not Inc., who are acting inequitably. By attempting to exclude Black, Mrs. Black, and Colson from participating in the Strategic Process and from preventing Inc. from acting to impede the adoption of the Rights Plan, the independent directors, the defendants claim, have overstepped their bounds. The defendants therefore contend that the Bylaw Amendments are a legitimate response to the independent directors' overreaching. More mundanely, the defendants argue that all of the Bylaw Amendments are consistent with the DGCL and International's charter.

 Before opining as to which side is, in my view, correct, it is useful to highlight the distinction these claims raise. It is a venerable and useful one in corporate law. In general, there are two types of corporate law claims. The first is a legal claim, grounded in the argument that corporate action is improper because it violates a

statute, the certificate of incorporation, a bylaw or other governing instrument, such as a contract. The second is an equitable claim, founded on the premise that the directors or officers have breached an equitable duty that they owe to the corporation and its stockholders. *Schnell v. Chris–Craft Industries, Inc.* is the classic recent statement of the principle that "inequitable action does not become permissible simply because it is legally possible." [124]

In addressing the Bylaw Amendments, and the later challenge to the Rights Plan, I am mindful of the distinction between these types of claims. The DGCL is intentionally designed to provide directors and stockholders with flexible authority, permitting great discretion for private ordering and adaptation. That capacious grant of power is policed in large part by the common law of equity, in the form of fiduciary duty principles. The judiciary deploys its equitable powers cautiously to avoid intruding on the legitimate scope of action the DGCL leaves to directors and officers acting in good faith. The business judgment rule embodies that commitment to proper judicial restraint. At the same time, Delaware's public policy interest in vindicating the legitimate expectations stockholders have of their corporate fiduciaries requires its courts to act when statutory flexibility is exploited for inequitable ends.

### The Bylaw Amendments Are Not Inconsistent With The DGCL

With those principles in mind, I now determine whether the Bylaw Amendments are effective. I begin by rejecting International's claim that the aspect of the Bylaw Amendments that abolishes the CRC is statutorily invalid. International bases that argument on § 141(c)(2), which states in pertinent part that:

> Any such committee, to the extent provided in the resolution of the board of directors, or in the bylaws of the corporation, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation . . . . [125]

International contends that § 141(c)(2) empowers only directors to eliminate a committee established by a board resolution and not stockholders acting through a bylaw.

I agree with the defendants that this argument is not convincing. Stockholders are invested by § 109 with a statutory right to adopt bylaws. By its plain terms, § 109 provides stockholders with a broad right to adopt bylaws "relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees." [126] This grant of authority is subject to the limitation that the bylaws may not conflict with law or the certificate of incorporation. [127]

Traditionally, the bylaws have been the corporate instrument used to set forth the rules by which the corporate board conducts its business. [128] To this

---

**124.** *Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437, 439 (Del.1971).

**125.** 8 *Del. C.* § 141(c)(2).

**126.** 8 *Del. C.* § 109(b).

**127.** *Id.*

**128.** *See Gow v. Consol. Coppermines Corp.,* 165 A. 136, 140 (Del.Ch.1933) ("[A]s the charter is an instrument in which the broad and general aspects of the corporate entity's existence and nature are defined, so the by-laws are generally regarded as the proper place for the self-imposed rules and regulations deemed expedient for its convenient function-

end, the DGCL is replete with specific provisions authorizing the bylaws to establish the procedures through which board and committee action is taken.[129] While there has been much scholarly debate about the extent to which bylaws can—consistent with the *general* grant of managerial authority to the board in § 141(a)—limit the scope of managerial freedom a board has, e.g., to adopt a rights plan, there is a general consensus that bylaws that regulate the process by which the board acts are statutorily authorized.[130] This includes the extent and manner in which the board shall act through committees.[131] Indeed, before the recent Bylaw Amendments, the International Bylaws heavily regulated the corporation's committee procedures.

In *Frantz Manufacturing Co. v. EAC Industries*,[132] the Delaware Supreme Court made clear that bylaws could impose severe requirements on the conduct of a board without running afoul of the DGCL. In *Frantz*, a majority stockholder implemented bylaw-amendments when it feared that the incumbent board would divest it of its voting power. The amendments required, among other things, that there be unanimous attendance and board approval for any board action, and unanimous ratification of any committee action. The Supreme Court found that the bylaws were consistent with the terms of the DGCL. In so ruling, the Court noted that the "bylaws of a corporation are presumed to be valid, and the courts will construe the bylaws in

ing to be laid down."); *see also* 1 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations § 1.10, at 1–12 (2002 Supp.) (quoting *id.*); 18A Am. Jur. 2d *Corporations* § 311 (2003) ("[B]ylaws are the laws adopted by the corporation for the regulation of its actions and the rights and duties of its members.").

129. *E.g.*, 8 *Del. C.* § 141(b) (allowing bylaws that set the number of directors on a board); *id.* (allowing bylaws that set the number of directors required for a quorum, with a statutory floor of 1/3 the total number of directors); *id.* (permitting bylaws that set the vote requirements for board action, with a statutory floor of a majority of directors present at meeting where quorum is met); *id.* § 141(f) (authorizing bylaws that preclude board action without a meeting).

130. For example, Professor Hamermesh's well-regarded and well-known article about stockholder-adopted bylaws argues that bylaws cannot be used to impede the managerial authority of the board to use a shareholder rights plan. But it also recognizes that a core function of the bylaws is to address the process by which the board makes decisions. Lawrence A. Hamermesh, *Corporate Democracy and Stockholder–Adopted By–Laws: Taking Back the Street?*, 73 Tul. L. Rev. 409, 484–85 (1998) (discussing bylaws affecting board governance, and noting that "the stockholders

have considerable authority to adopt by-laws limiting the way in which the board of directors conducts its business"). Other distinguished scholars also believe that stockholders have broad statutory power to pervasively regulate board processes in the bylaws, albeit subject to the constraints of equity. *See generally* John C. Coates IV & Bradley C. Faris, *Second–Generation Shareholder Bylaws: Post–Quickturn Alternatives*, 56 Bus. Law. 1323 (2001); John C. Coffee, Jr., *The Bylaw Battlefield: Can Institutions Change the Outcome of Corporate Control Contests?*, 51 U. Miami L. Rev. 605 (1997); Jeffrey N. Gordon, *"Just Say Never?" Poison Pills, Deadhand Pills, and Shareholder–Adopted Bylaws: An Essay for Warren Buffett*, 19 Cardozo L. Rev. 511 (1997).

131. *E.g.*, 8 *Del. C.* § 141(c)(2) (authorizing the bylaws, within certain limits, to set forth the ceiling of powers a board committee may have); *id.* (permitting bylaws that allow committee members unanimously to appoint a replacement member of a board committee, should a current member of that committee be absent or disqualified); *id.* § 141(f) (allowing the bylaws permit committee action without a meeting); *id.* § 141(i) (permitting the bylaws to restrict board committees from having telephonic meetings).

132. 501 A.2d 401 (Del.1985).

a manner consistent with the law rather than strike down the bylaws."[133]

■■■ Here, International argues that the Bylaw Amendments run afoul of § 141(c)(2) because that provision does not, in its view, explicitly authorize a bylaw to eliminate a board committee created by board resolution. By its own terms, however, § 141(c)(2) permits a board committee to exercise the power of the board only to the extent "provided in the resolution of the board . . . or in the bylaws of the corporation." As the defendants note, the statute therefore expressly contemplates that the bylaws may restrict the powers that a board committee may exercise. This is unremarkable, given that bylaws are generally thought of as having a hierarchical status greater than board resolutions, and that a board cannot override a bylaw requirement by merely adopting a resolution.[134] Further, in *Frantz*, the Delaware Supreme Court ruled that bylaws requiring that the full board decide matters by unanimous vote are permissible.[135]

Moreover, I find International's argument that the failure of § 141(c)(2) to use magic words like "unless otherwise provided in the bylaws" renders board-created committees invulnerable from elimination through a bylaw amendment without merit. The words of § 141(c)(2) plainly subordinate board resolutions creating and empowering committees to overriding bylaw provisions, especially when read in concert, as they must be, with the capacious authority over a board's processes that § 109 and other provisions of § 141 plainly grant.

For these reasons, I agree with the defendants that the provision in the Bylaw Amendments eliminating the CRC does not contravene § 141(c)(2).[136] The question therefore becomes whether that and the other Bylaw Amendments are impermissible because they were adopted for an inequitable purpose.

*The Bylaw Amendments Are Inequitable*

■■■ In *Frantz*, the Supreme Court also made clear that the rule of *Schnell*—that inequitable action does not become permissible simply because it is legally possible—applies to bylaw amendments. In *Frantz*, the Supreme Court, citing *Schnell*, reviewed bylaw amendments undertaken by the majority stockholder to ensure that they were not inconsistent with any rule of common law and were reasonable in application. In the circumstances of that case, the Supreme Court found the very restrictive bylaws at issue proper because the majority stockholder—which had committed no acts of wrongdoing—was acting to protect itself from being diluted.

In this case, the Bylaw Amendments were clearly adopted for an inequitable purpose and have an inequitable effect. In November 2003, Black was confronted with a very difficult set of circumstances. One option for him was to play it tough. He could have caused Inc. to file a written

---

**133.** *Id.* at 407.

**134.** *Cf.* 18A Am. Jur. 2d *Corporations* § 311 (2003) ("A resolution is not a bylaw. It is an informal enactment of a temporary nature providing for the disposition of certain administrative business of the corporation. In contrast, bylaws are the laws adopted by the corporation for the regulation of its actions and the rights and duties of its members.").

**135.** *See Frantz*, 501 A.2d at 405, 409.

**136.** For similar reasons, I reject International's argument that that provision in the Bylaw Amendments impermissibly interferes with the board's authority under § 141(a) to manage the business and affairs of the corporation. Sections 109 and 141, taken in totality, and read in light of *Frantz*, make clear that bylaws may pervasively and strictly regulate the process by which boards act, subject to the constraints of equity.

consent removing the entire board (using the total and personal dominion he clearly exercises over Inc.). If he had played it tough and did not act quickly or boldly enough to remove the board, Black could have been stripped of all his offices, been confronted with a board-adopted shareholder rights plan, a strong board reference to the SEC, and other events that he wished to avoid—including an immediate lawsuit against Inc. Instead of this approach, Black undertook to cut the best deal he could and made binding contractual obligations to International.

Those obligations have been discussed at fulsome length already, but they clearly included a duty of energetic fidelity to the Strategic Process, a Process that was to be controlled by the entire board. In the Restructuring Proposal, changes had been made to the board to strengthen its independent majority. Black understood that it was that independent board that would ultimately oversee his co-leadership of the Strategic Process with Paris.

As recounted, Black (acting for himself and as Inc.'s agent) violated the Restructuring Proposal and his fiduciary duties and undermined the Strategic Process. Once the independent directors of International acted to try to alleviate the harm caused by Black and to ensure the proper procession of the Strategic Process in accordance with Black's prior agreement (which was understood by Inc. and Ravelston), Black caused Inc.—with support from the Barclays—to adopt the Bylaw Amendments. The plain purpose of these Bylaw Amendments was to disable the International board and prevent it from completing the Strategic Process and utilizing the tools available to the board under the DGCL.

Although it is no small thing to strike down bylaw amendments adopted by a controlling stockholder, that action is required here because those amendments complete a course of contractual and fiduciary improprieties. Inc.'s written consent was the culmination of Black's efforts on his (and Inc.'s) behalf to end-run the Strategic Process he had agreed to lead and support.[137]

---

137. Delaware courts have previously struck down inequitable bylaw amendments. For example, in *In re Osteopathic Hospital Ass'n*, 195 A.2d 759 (Del.1963), the bylaws of an association composed of osteopathic physicians contained a provision that allowed laymen to be elected to the association by a majority vote of members of the association. The board of trustees of that association contained both members and nonmembers of the association. The trustees amended the bylaws to make all trustees full voting members of the association, thus taking control of membership of the association from the physicians and giving it to the laymen. The Delaware Supreme Court declared the bylaw amendment "patently unreasonable as a matter of law." *Id.* at 765. The effects of this validly passed bylaw were "an abuse far too apparent and unreasonable for [the Court] to permit them to stand." *Id.*

Similarly, in *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151 (Del.Ch. Jan.14, 1991), this court did not enforce an advance notice bylaw provision against stockholders seeking to nominate a dissident slate of board directors. In that case, the board waited until after the time contemplated by the provision to announce its alliance with a stockholder having substantial holdings in the company, who sought to change the direction and management of the company. The board further entered into contract with the stockholder prohibiting the board from waiving the bylaw. Because the plaintiffs did not know of this possibility during the time contemplated by the bylaw, whose facial validity was not contested, *see id.* at *4, the court, citing *Schnell*, held that enforcement of the bylaw would be inequitable. Similar to this case, *Hubbard* was decided based on the unique facts of the case before the court. *Id.* at *1, *4. Specifically, the court stated, "[t]he question ... is not whether the Court has the power to imply an equitable duty ..., but

Given this record, Inc.'s claim that it was acting to prevent its disenfranchisement as a stockholder does not tug at my equitable heartstrings. Striking down the Bylaw Amendments does not render Inc. powerless to wield a majority vote in any contested election on any matter. But it does prevent Inc. from inequitably disabling the International board from taking effective action at the board level that is within the authority granted to the board by § 141 and other provisions of the DGCL. This remedial action is proportionate to the injury inflicted on International by Black, who acted at all times with the imputed knowledge and assent of Inc.

Notably, this remedial action does not distort the Strategic Process by leaving Inc. helpless. As a practical matter, the International board must remain conscious of Inc.'s voting power in developing strategic options. The International directors continue to owe duties to Inc. and cannot take action that would unfairly advance the interests of other stockholders over those of Inc. But it does mean that the board can take good faith action, within its domain, without being subject to a veto by Black or other directors subject to his control.

For these reasons, I conclude that the Bylaw Amendments are inequitable and are of no force and effect.

### Is the Rights Plan Permissible?

■ The remaining merits issue to be addressed is the defendants' claim that the

Rights Plan should be declared ineffective. The defendants attack the Rights Plan on several fronts. As a preliminary matter, the defendants argue that the DGCL does not authorize the adoption of a rights plan that would be triggered by the sale of an upstream corporation that owns a controlling voting block in the underlying corporation adopting that rights plan.

Alternatively, the defendants argue that the CRC did not satisfy its *Unocal* duties in adopting the Rights Plan. Even more assertively, the defendants insist that the Rights Plan must be addressed, not under *Unocal*,[138] but instead under *Blasius*.[139] The justification for this is said to exist in the combined effect of the Rights Plan and the Consent Order, which, when taken together, the defendants believe work a purposeful disenfranchisement of Inc.'s voting rights as a controlling stockholder.

International counters each of these arguments.[140] It seeks a declaration that the Rights Plan was permissibly adopted and has made the effectiveness of the Rights Plan contingent on a judicial declaration to that effect.

I now address the defendants' arguments.

### The Rights Plan Is Not Inconsistent With The DGCL

I begin with the defendants' claim that the Rights Plan is legally impermissible. This claim only has force if the Delaware

whether it should exercise that power *in these circumstances.*" *Id.* at *11 (emphasis added).
Although these cases dealt with board-adopted bylaws and their affect on the stockholder franchise, the well-established proposition they rest upon, the idea that inequitable bylaws will not be enforced, is the one underlying the decision here.

138. *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985).

139. *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651 (Del.Ch.1988).

140. The defendants also argue that the CRC had already been effectively disbanded by the Bylaw Amendments before it adopted the Rights Plan. As I have concluded that the Bylaw Amendments were adopted for inequitable purposes and therefore ineffective, this argument necessarily fails.

Supreme Court's decision in *Moran v. Household International, Inc.*[141] is no longer binding precedent. But the *Moran* decision was recently reaffirmed as good law by the Delaware Supreme Court.[142]

■ *Moran* held that various sections of the DGCL, including §§ 141(a), 151, and 157, gave directors wide statutory authority to issue a rights plan, even if the rights plan had the effect of discriminating against or diluting particular stockholders.[143]

The passage of time has dulled many to the incredibly powerful and novel device that a so-called poison pill is. That device has no other purpose than to give the board issuing the rights the leverage to prevent transactions it does not favor by diluting the buying proponent's interests (even in its own corporation if the rights "flip-over"). When *Moran* was argued, the plaintiffs attacking the rights plan argued that the General Assembly never contemplated that the DGCL's grant of authority could be utilized to issue such rights to stockholders solely to provide the directors with a defensive weapon of extraordinary potency.

That argument was emphatically rejected. In so ruling, the Delaware Supreme Court emphasized the elastic nature of the DGCL, and its responsiveness to evolving business and market circumstances. Our corporation law is not "static," the Court said, quoting *Unocal.*[144]

In this case, I invited the defendants to tell me what provision of the DGCL prohibits the Rights Plan adopted by the CRC. They provided no argument of that sort. Nor have they contended that the precise language of the Rights Plan adopted by the CRC is unusual in its application to upstream corporations or "affiliates." This is unsurprising, too.

Mr. Lipton's famous invention is not easily escaped by corporate form. Imagine this scenario, for example. Suppose a corporation, Target, had ten institutional investors who collectively owned 30% of the stock. A potential buyer owns 14.9%, just below the trigger of the company's rights plan. To get around the plan, the buyer makes an offer to buy holding companies at a price *pro rata* to their ownership of Target's shares, provided those holding companies own no other assets. The ten institutional investors promptly form cheap and easy holding corporations, transfer their Target shares to them, and cause the holding companies to sell themselves to Buyer. In this scenario, would the typical pill be defenseless?

The answer is: Of course not. Standard rights plans are drafted precisely to cover up-stream transactions of this kind.

What the defendants really are arguing therefore is that there is a common law doctrine that prohibits the board of a non-wholly owned subsidiary from using a rights plan that would deter the ability of its parent company to sell itself (or its control bloc of subsidiary shares). This is not a statutory argument; it is an argument about the extent to which the equitable duties owed by directors to all stockholders, particularly in this case, to controlling stockholders, preclude those directors from using a rights plan to, as a practical matter, inhibit stockholders from alienating their shares or other property

---

141. 500 A.2d 1346 (Del.1985).

142. *Account v. Hilton Hotels Corp.,* 780 A.2d 245, 249 (Del.2001).

143. 500 A.2d at 1357.

144. *Id.* at 1351 (quoting *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 957 (Del.1985)).

by threatening to dilute the purchaser's resultant equity interest.

In considering this argument, I do not find the defendants' atypical devotion to corporate formalities in this particular context helpful.[145] The Rights Plan only has bite if a purchaser, like the Barclays, cares about its ultimate equity interest in International. If the Barclays trigger the flip-in provisions of the Rights Plan by acquiring ultimate control over 19.9% of International's stock, the dilution they and Inc. will suffer will be at the International level. They will still control Inc. Although there are good reasons why fiduciary duty principles ought to take into account the legitimate expectations of controlling stockholders in evaluating directors' use of a rights plan, the mere fact that a rights plan inhibits the ability of an intermediate holding company to sell itself does not make that rights plan statutorily impermissible, or even inequitable in all circumstances. Minority stockholders confront the pill as an obstacle to accepting beneficial offers all the time.

Put bluntly, the permissibility of the Rights Plan hinges on the equities.

### The International Board Has Met Its Unocal Burden And The Rights Plan Is Permissible

█ The traditional test for examining whether a Rights Plan was permissibly adopted is that set forth in *Unocal.* Under *Unocal,* a defensive measure such as a rights plan may only be adopted if the board reasonably identified a threat to the corporation to which the rights plan is a proportionate response.[146] Here, the defendants say that the CRC's decision to adopt the Rights Plan cannot satisfy *Unocal* because its knowledge of the Rights Plan's complex workings is grossly inadequate, the CRC identified no legitimate threat to International, and the Rights Plan is a disproportionate response. I do not accept these arguments and believe that International has sustained its affirmative duties under *Unocal.*

█ I begin with a preliminary observation about the CRC's level of care. For perfectly understandable reasons given Black's conduct, International has not waived the attorney-client privilege. As a result, I do not have testimony about the legal advice given the CRC regarding the operation of the Rights Plan. The defendants seized on this and delighted in asking the independent directors detailed questions about the operation of the Rights Plan. I am not convinced by these quizzes that the independent directors did not inform themselves sufficiently before adopting the Rights Plan.

In this regard, it is notable that the International board began examining the adoption of the Rights Plan in early January. They received a detailed presentation about rights plans from counsel at that time. That confidential presentation is in the record because Black sent it to Triarc, a third-party he was dealing with in the course of his conduct of business for

---

145. It is atypical because Black and Inc.'s behavior belies any such ardent devotion in other contexts.

146. *Unocal,* 493 A.2d at 955; *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1387 (Del. 1995). *See also Chesapeake Corp. v. Shore,* 771 A.2d 293, 330 (Del.Ch.2000) ("When the board of a Delaware corporation acts to oppose or defend against a hostile bid for corporate control, a heightened standard of judicial review applies. In order for the board's defensive actions to survive this enhanced judicial scrutiny, the board must establish: (1) that it had reasonable grounds to believe that the hostile bid for control threatened corporate policy and effectiveness; and (2) that the defensive measures adopted were reasonable in relation to the threat posed.").

Inc. Even more important, the directors' testimony convinces me that they understood the basic manner in which the Rights Plan operated and retained sufficient flexibility to redeem the Rights easily and cheaply if a transaction they favored came along.[147] Equally relevant is the exigencies under which the CRC acted during a period in which the directors were continually engaged in meetings to consider the evolving developments since November. Given Black's course of behavior, the CRC's decision to adopt the Rights Plan promptly was not unreasonable, as Black's own actions shortened the time the CRC had for deliberation. In sum, I am persuaded that there was no breach of the duty of care that compromises the reasonableness of the CRC's actions.

I turn therefore to *Unocal's* first prong, which requires the board to identify a threat to the corporation's best interests after a reasonable investigation. The CRC easily passes this prong.

As noted, the Barclays Transaction is the culmination of an improper course of conduct by Black. If consummated, that Transaction will thwart the effective and thorough completion of the Strategic Process Black had contractually promised to support. The Strategic Process resulted from a decision by International's directors to maximize shareholder value by exploring strategic alternatives, including a possible sale of the entire company or of key assets, like the Telegraph. This situation is importantly distinct from the usual situation when a controlling stockholder closes down a subsidiary's exploration of such alternatives. In the typical case, the parent owes no contractual or fiduciary obligation to permit the subsidiary to proceed.

Here, by contrast, International secured a binding commitment from its ultimate controlling stockholder, Black, who dominated Inc., to lead its Strategic Process and to seek an International Level transaction that would benefit its stockholders. Black even told the board that he sought a deal for the "equal and ratable" benefit of all International stockholders. Critically, Black promised to eschew an Inc.-level transaction that would negatively affect the Process except in narrow circumstances that do not exist.

The defendants stress, of course, that the Restructuring Proposal does not require Black or Inc. to vote as stockholders for any deal arising out of the Strategic Process. That is, of course, true. That fact ensures that the International board will be incentivized to find an alternative attractive to Inc. Because Inc.'s value is overwhelmingly tied to International's value, the higher the price International can get for itself for its assets, the better that is for Inc. No doubt the possibility of a negotiation over the extent to which Inc. should get some type of control premium might arise, despite Black's prior representations that he was seeking a deal for the "equal and ratable" of all International stockholders.

These end-of-the-game issues do not render Black's contractual promise illusory or valueless. Rather, because Black, and therefore Inc., are willing sellers, the Strategic Process has great promise. There is no reason to believe that the International directors cannot identify an option that would find favor with Black (and therefore Inc.) as a stockholder. That certainly was what Black and Inc. knew was contemplat-

---

147. The defendants argue that the Rights Plan does not give sufficient flexibility to the International board to redeem the Rights before they become separately tradable. International has convinced me otherwise and that it retains sufficient discretion to address any flaws in the drafting of the Rights Plan still.

ed when the Restructuring Proposal was signed.

The CRC's determination that the Barclays Transaction thwarted the Strategic Process, denies International the bargained-for benefits of the Restructuring Proposal, and is a serious threat to International is a reasonable one. If consummated, the Barclays Transaction will prevent International from conducting the full market and transactional exploration contemplated by the Proposal. The Barclays, as buyers, seek the "once in a life-time opportunity"[148] to control the Telegraph, and can hardly be expected to have an interest in turning around and selling that control or in competing in an auction.

The CRC also identified other threats. Two deserve special mention.

The first is a supposed concern that Black is circumventing the Tag–Along Provision by selling Inc. itself in order to deliver super-voting Class B shares to a buyer in a non-Permitted Transaction. I tend to agree with the defendants that this concern alone would not constitute a cognizable threat for *Unocal* purposes. International has filed a claim in this case arguing that the Tag–Along Provision is triggered by a sale of Inc. by virtue of the implied covenant of good faith and fare dealing. But International did not move for expedited treatment of that claim and it is a facially weak one given the specific language of the Tag–Along Provision. More appropriate, however, is the concern that Black has undermined International's ability to get the best deal by end-running the Strategic Process and pre-empting a rational search for the highest price. Given that the Tag–Along Provision has a certain spirit, that Inc. now derives nearly all of its value from International, that Inc. arguably owes International $16.55

million in non-compete payments Black represented Inc. would repay, and that Black had assured he was seeking a transaction for the "equal and ratable" benefit of International's public stockholders, the CRC could legitimately consider whether International had the leverage to ensure that the actions of Black (and Inc., which he controls) did not deprive the International public stockholders from fairly benefiting from the Strategic Process to which it was contractually entitled. Viewed this way, however, this concern is just another way of restating the primary threat already discussed.

The next threat worth mentioning relates to what Black might do with his share of the proceeds from the Barclays deal. This threat seems to have motivated the Special Committee's advisor, Mr. Breeden, more than the directors. Breeden's concern that Black might transfer assets to jurisdictions from which recoupment is practically impossible is not irrational. After all, Black had already reneged on his repayment duties under the Proposal and had taken no steps to repay his debts to Ravelston and Inc. But this threat is a decidedly unusual one to give rise to a rights plan as other more directly tailored legal remedies (e.g., an attachment action) exist to address it. In and of itself, therefore, it is difficult to imagine it being the justification for a rights plan, at least before a court has entered a judgment requiring a potentially selling stockholder to pay the corporation sums certain, the stockholder has not honored the judgment, the sales transaction does not provide for an escrow in favor of the company, and there is not a practicable way to obtain judicial review before the selling stockholder receives the sale proceeds. Even in that circumstance, the use of a poison pill

---

148. A. Barclay Dep. at 116.

as a creditor's tool would, I venture, be the object of extremely skeptical judicial review. In sum, I am not prepared to conclude that the fear that a party who might be found liable to the corporation will hide his newly liquid funds is the type of threat that satisfies the *Unocal* requirement of a threat to corporate policy and effectiveness.[149]

For all these reasons, therefore, I believe that the proportionality of the CRC's adoption of a rights plan must be measured against one primary threat: the injury that the Barclays Transaction poses to the board's ability to complete the contractually "bargained" for Strategic Process. This threat is a potent one justifying a strong response, arising as it does out of a course of improper conduct by Black that subverted the corporation's business strategy.

▮ The defendants complain, however, that the Rights Plan is disproportionate to this threat. They find it perverse that a subsidiary's independent board would use a poison pill to keep its parent corporation from selling itself.

And, in the ordinary case, I believe that argument would generally be a decisive one. As a typical matter, the replacement of a subsidiary's controlling corporate

stockholder with another through a transaction at the parent level should pose no cognizable threat to the subsidiary. The parent has a legitimate right to sell itself absent breaching some recognized duty to the subsidiary. There is utility to respecting this general freedom,[150] which is a natural expectation of the owner of a controlling position and this freedom should be expected by the subsidiary's minority stockholders who have no common or statutory right to tag-along in a transfer of control at the parent level.

At the same time, however, American corporation law has recognized that there are circumstances when a subsidiary has a legitimate right to contest a parent's sale of its control position. The classic example is if the controlling stockholder is going to sell to a known looter.[151] Chancellor Allen was open to the possibility that other extraordinary scenarios might justify subsidiary resistance to a controlling stockholder that wrongly endangers the corporation's best interests, even by taking action to dilute the controlling stockholder's control position.[152] That extraordinary action, Chancellor Allen noted, might be justified when a "controlling shareholder ... was in the process or threatening to violate his fiduciary duties to the corpora-

149. I admit that here I am blending, in the interests of efficiency, my threat analysis with considerations of proportionality. I suppose one could imagine a circumstance when a party facing a large lawsuit by a corporation made a takeover bid. Whether the bidder's status as a defendant could be factored into the board's response presents distinct considerations from those present here.

150. *See, e.g.,* Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Shareholders,* 152 U. Pa. L. Rev. at 785, 793–96 (2003) (arguing that such transfers generally should proceed without subsidiary interference because, coupled with the rule that controlling stockholders

cannot obtain unique benefits during ongoing operations, such a sale would benefit minority stockholders by increasing the common value of the controlled corporation).

151. *See Harris v. Carter,* 582 A.2d 222, 233 & n. 15 (Del.Ch.1990); *see also* Gilson & Gordon, 152 U. Pa. L. Rev. at 795 ("The general rule that a controlling shareholder can sell its shares at a premium is qualified ... when it is apparent that the purchaser is likely to extract illegal levels of private benefits from operating the controlled corporation.").

152. *Mendel v. Carroll,* 651 A.2d 297, 306 (Del. Ch.1994).

tion." [153]

By parity of reasoning, if actual action to dilute the majority might be justified, the less extreme act of interposing a rights plan should not be ruled out entirely as a permissible response to a controlling stockholder's serious acts of wrongdoing towards the corporation. In that circumstance, the use of a rights plan to stop the bleeding might be a proportionate response. [154] By operation of its terms, the Rights Plan merely acts as an inhibition on alienation or additional purchases and does not work an immediate dilution. [155]

Moreover, the equitable sustainability of a rights plan to protect against such threats does not turn on whether the ultimate controlling stockholder is selling its control bloc directly or is selling the intermediate holding company through which it exercises control. It is common to use an intermediate holding company to control a public subsidiary. To differentiate between direct controlling stockholders and cases where an intermediate holding company acts as a controlling stockholder would be to elevate form over substance, and to leave the subsidiary helpless if there is, e.g., a threat that the intermediate holding company will be sold to a looter.

In this case, the CRC's deployment of the Rights Plan is proportionate, in view of the extraordinary circumstances International confronts. The most direct way that

International can protect itself and pursue the Strategic Process Black promised to support is by using the Rights Plan. The use of the Rights Plan for this purpose does not mean, as the defendants suggest, that International's board may ignore its obligations to Inc. (or for that matter, Black) as an International stockholder. Obviously, in considering what strategic option to pursue the International board must consider Inc.'s interests, which should coincide with those of other stockholders insofar as International is attempting to obtain the maximum realizable value for its assets in the aggregate. In the pie-cutting process, moreover, Inc. will have the leverage that comes with its voting power, which gives it a veto over any merger or liquidation it does not favor. Furthermore, the International board has every incentive to deliver a better deal for Inc. than the Barclays Transaction precisely in order to obtain Inc.'s assent.

Another factor is critical to my decision. The proportionality of the Rights Plan's use now will not sustain its use forever. Rather, the justification the board has advanced necessarily limits the duration of the Plan's use. Once the board has completed the Strategic Process and developed its preferred option, the further use of the Rights Plan would be suspect, absent further misconduct justifying its continued use. In this sense, the board seeks to use the Rights Plan in a manner analogous to

---

**153.** *Id.*

**154.** Because the Barclays Transaction threatens the International public stockholders with a cognizable loss—the contracted-for benefits in ¶¶ 6 and 7 of the Restructuring Proposal—the use of the Rights Plan here is consistent with the distinction recently advocated by Professors Gilson and Gordon. This is not a situation where the International board simply is using a rights plan to hold up a parent from an ordinary decision to sell itself, a decision that a subsidiary usually has no legit-

imate interest in impeding or using as an opportunity to extract value from its parent. *See* Gilson & Gordon, 152 U. Pa. L. Rev. at 812. Furthermore, it is worth noting the obvious: this decision merely reviews the choice of the CRC to adopt a rights plan and implies nothing about whether it had a duty to take that step.

**155.** Of course, the decision not to redeem the rights remains subject to *Unocal*-level scrutiny.

that articulated by Chancellor Allen in *Interco*,[156] giving the board the breathing room to identify value-maximizing transactions.

The time-limited use of the Rights Plan for this purpose is, in many ways, the most narrowly tailored remedy for Black's misbehavior. It flexibly polices the Restructuring Proposal while allowing Inc. to move at a later time to demand redemption.

Before closing on this subject, I must address the defendants' argument that the Rights Plan is subject to the *Blasius* compelling justification standard. The defendants argue that *Blasius* applies because they believe that the Rights Plan, working in concert with the Consent Order, precludes removal of the board and thereby disenfranchises Inc. stockholders.

I am not persuaded by this argument. The Rights Plan does not affect Inc.'s voting rights in any novel or material way. Although it would have been preferable for the International board to explicitly consider the Consent Order when it adopted the Rights Plan, that failure is not material. A fair reading of the Consent Order shows that it is not directed at the same threat as the Rights Plan. The Consent Order's provision for the appointment of the Special Monitor is tailored to protecting the Special Committee process and the Special Monitor is given no authority to stop any business transactions unilaterally. Rather, the Special Monitor would, as I read the Order, have to seek judicial relief in order to stop what he perceived as wrongful actions by the controlling stockholders. As important, the Consent Order

is of limited duration and is intended only to last until the Special Committee has finished its work, which, under the Order itself, presumptively will occur in June 2004.

Finally, the consequences imposed as a result of electing a new board were demanded by the SEC, in circumstances in which Black (Inc.'s dominating stockholder and CEO) had left International with no leverage. The SEC's independent demand to which International assented cannot be transmuted into an integrated defensive strategy involving the Rights Plan. It was not so conceived.

As important, even if *Blasius* did apply to the Rights Plan, a sufficiently compelling justification exists for any incidental burden on Inc.'s voting rights. Inc. is not blameless here; it is charged with knowledge of the misconduct of its agent, Black. The time-limited use of a Rights Plan is permissible in these extraordinary circumstances.

Put summarily, neither the Rights Plan nor the Consent Order, by their own terms prohibit Inc. from electing a new board[157] and any consequences attaching to such action are not ones about which Inc. can equitably whine.

*Summary of the Merits Rulings*

It is useful to summarize my merit conclusions. First, International has shown a reasonable probability of success on the merits of its claims that Black violated the Restructuring Proposal and his fiduciary duties. Indeed, those findings are not entirely probabilistic because I make final

156. *City Capital Assocs. Ltd. P'ship v. Interco Inc.*, 551 A.2d 787, 797–99 (Del.Ch.1988). *See also* Ronald J. Gilson & Reinier Kraakman, *Delaware's Intermediate Standard for Defensive Tactics: Is There Substance to Proportionality Review?*, 44 Bus. Law. 247 (1989).

157. This is not to say that there might not be a non-frivolous argument that the Restructuring Proposal acts as some restraint on such action until the completion of the Strategic Process.

and necessary findings to that same effect in ruling on the Bylaw Amendments and the Rights Plan. Second, the Bylaw Amendments are ineffective because they were undertaken for inequitable purposes and were the culmination of a pattern of wrongful conduct. Finally, for the reasons indicated, the CRC's adoption of the Rights Plan was a proper exercise of statutory authority that was consistent with the CRC's fiduciary duty to protect the corporation.

### International Is Entitled to An Injunction Against the Barclays Transaction

The final issue I must consider is whether International has earned the right to a preliminary injunction against the Barclays Transaction. International has met the first element of its burden, which is to demonstrate a probability of success on the merits. Here, that factor weighs even more heavily in International's favor because my merits determination is, for all practical purposes, akin to a final ruling.

■ Thus, there remain the questions of 1) whether International has shown a sufficient threat of irreparable injury and 2) whether the equitable balance of hardships supports an injunction.[158] Injury is irreparable when a later money damage award would involve speculation.[159] Losses of strategic opportunities are often found to pose a threat of irreparable injury.[160]

■ As to the first question, there is no doubt International faces irreparable injury. Without an injunction, it will be practically impossible to rescind the Barclays Transaction, the Strategic Process will be undermined, and International will lose the unique opportunities the Process may develop. Relevant to this conclusion would be the concomitant difficulty of shaping monetary relief. If no injunction issues, the damages inquiry might well have to involve imprecise estimates, such as a comparison of what price International would have gone for in an auction, with a possible award to the International public stockholders of the difference between that price and the market price of International after the closing of the Barclays Transaction. For present purposes, it suffices to note the imponderability of such a later inquiry and the utility of avoiding those uncertainties by curbing the harm now.

■ I now consider the balance of hardships. In their arguments, the defendants make much of the interests of Inc.'s public stockholders. They stress that these stockholders have an opportunity to sell to the Barclays at a favorable price and that an injunction will harm them. The difficulty with this argument is, if accepted, the task of protecting International's legitimate interests becomes im-

158. *See In re Aquila, Inc. S'holders Litig.*, 805 A.2d 184, 189 (Del.Ch.2002) (noting that the moving party, in addition to showing a reasonable probability of success on the merits, must show "irreparable harm will result if an injunction is not granted, and that the balance of equities favors the issuance of the injunction").

159. *See Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 586 (Del.Ch.1998) ("Preliminary injunctive relief may be appropriate when plaintiff's damages are difficult or impossible to quantify."); *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del.Ch.2001) (finding irreparable injury where "a post-hoc evaluation will necessarily require the court to speculate").

160. *See ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95, 110 (Del.Ch.1999) ("[T]he loss of a 'unique acquisition opportunity' may constitute an irreparable injury." (citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 184 (Del.1986))).

possible. The Barclays made a deal with Black because they want to control International's assets, as a "means towards the end" of controlling the Telegraph assets.[161] They have no apparent interest in taking a minority voting position in Inc. Moreover, the Inc. public stockholders are regrettably dependent on the court's assessment of the conduct of their company's dominating force, Black. He engaged in wrongful acts for himself and as Inc.'s agent, acts that Inc. is charged with knowing about. As important, the threat that an injunction poses to the Inc. stockholders is a mild one. The record is uncontradicted that International has valuable assets that have drawn considerable interest from possible buyers. As a result, the Inc. public stockholders may well obtain a better result if an injunction issues.

The one threat from the injunction that the defendants press upon me the most urgently is that Inc. might file for protection under Canada's equivalent to our federal Chapter 11 of the Bankruptcy Code. This "threat" does not come from an injunction but from the testifying lips of Black's associate and friend, Peter White, who has recently become Inc.'s COO. *This nihilistic pressure tactic seems to a neutral mind absurd, when advanced by a director of a corporation with three times more assets than liabilities.* It is even more ludicrous coming from a company that can satisfy its short-term liquidity needs by calling on Black, Radler, and Ravelston to meet their undisputed obligations to Inc. Combine that with Inc.'s failure to explore short-term financing options with its $18 million in unencumbered International shares and its real estate assets and an unsavory taste is left. Nonetheless, the recklessness suggested by the mere making of the threat inclines me to believe that it ought be addressed by measures that relieve the court's and International's conscience of this unwarranted burden. To address the possible harm flowing to Inc. because its directors did not take responsible steps to address its short-term liquidity problem, I will require as a condition of the injunction, and in lieu of a bond, that International offer short-term financing to Inc., directly or indirectly, to help Inc. cover its upcoming note payment at favorable rates but with full security to guarantee repayment. This condition is contingent on Inc. taking prompt steps to require Black, Radler, and Ravelston to live up to their substantial obligations to Inc.

Next, the defendants have made some strained arguments based on Ravelston's separate dignity. Clearly, Black acted with authority from Ravelston in entering the Restructuring Proposal and completely dominates that private holding company, whose only other owners besides Black are under Black's control. Any harm to Ravelston is not an equitable consideration with any force.

The same is true of the Barclays. They chose a pragmatic course of action that they knew was less than fully candid. They were aware of Black's obligations to International and his infidelity, yet remained silent while he misled the International board. While there is no reason to believe the Barclays are not reputable operators and fiduciaries of their own companies, they have no standing in equity to complain about an injunction to ensure that International can conduct a real Strategic Process, rather than be stuck with the Barclays–Black "fait accompli."

An injunction will not preclude the Barclays from purchasing ultimate control of the Telegraph. It will simply make them do so through the Strategic Process that

---

**161.** F. Barclay Dep. at 30.

their bargaining partner Black agreed to lead and support. If, as they say, the Barclays wish only the best for International's public stockholders, they can craft a fair bid for the company and press for its acceptance by the CRC.

In comparison to these harms, hardship that will befall International and its public stockholders is far more compelling a consideration. Their rights have been seriously injured and a preliminary injunction against the consummation of the Barclays Transaction is in order. For obvious reasons, a preliminary injunction will also issue restraining Black from taking action to violate his duties under the Restructuring Proposal, including ¶¶ 6 and 7. This means that Black must refrain from undermining the Strategic Process, must inform International candidly and completely of all opportunities within the scope of that Process that come to his attention, and refrain from pursuing transactions involving Inc. except in strict accordance with ¶ 7. Having made it impossible, however, for International to include him in the Strategic Process as a leader, Black has no right to complain about his exclusion from the work of the CRC in leading that Process and his right to access to materials as a director may be conditioned on his execution of a confidentiality agreement.

The precise shape of the injunction I will enter should be the subject of good faith negotiations by the parties and they should submit an agreed-upon form of order within three days. Until a formal order is entered, the Barclays may not take any steps to consummate the Barclays Transaction.

### Conclusion

For all the foregoing reasons, 1) the Bylaw Amendments are declared ineffective and judgment will be entered to that effect; 2) the Rights Plan was permissibly adopted and a declaration to that effect is proper; and 3) International is entitled to a preliminary injunction against the Barclays Transaction and further breaches of the Restructuring Proposal. An implementing order shall be submitted by the plaintiffs, upon approval as to form.